**AMERICAN HOME PRODUCTS CORPORATION**

v.

**The UNITED STATES.**

**No. 422–75.**

United States Court of Claims.

June 13, 1979.

---

William M. Chanson, New York City, Atty. of Record, for plaintiff.

Bruce W. Reynolds, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge:

This case involves the tax effects of certain forward sale contracts of foreign currency. We must first determine the proper amount of dividends declared in British pounds when the American taxpayer immediately applied most of the dividends it received to cover two of its forward sale contracts of pounds into dollars. We conclude that the dividends must be measured by the prevailing exchange rate at the time of distribution to taxpayer, not the better rate contractually mandated by the forward sale agreements. The second issue involves characterization of taxpayer's gain from the assignment of two other foreign currency futures contracts. Each contract was held more than six months, the then prevailing long term holding period. We decide that the assignment was a bona fide transaction, that the gain was long term, and that the special rule of Internal Revenue Code section 1233 governing short sales is inapplicable.

Both parties have moved for summary judgment on the following stipulated facts: Plaintiff American Home Products ("taxpayer" or "American Home") is a domestic corporation which produces a variety of foods, ethical and non-prescription drug products, and housewares. In 1967 it had a controlling interest in five foreign subsidiaries located in the United Kingdom.[1] Taxpayer expected to receive (late in 1967 or in 1968) substantial dividends payable in pounds sterling from its British subsidiaries, but was concerned about the effects on its income from the dividends of a possible devaluation of the pound. After some planning and study, plaintiff (in September and early October of 1967) entered into four futures contracts with two large American

---

1. It owned 100% of four of the subsidiaries and 69% of the fifth, making them controlled foreign corporations under I.R.C. § 957 and subpart F of the Code. There is no dispute over the application of subpart F.

banks (which we shall call Continental and Manufacturers Hanover), each promising to sell one year later a specified amount of pounds at approximately $2.80 per pound (which was then the dollar value of the pound). Plaintiff in effect made a "short sale" of pounds—promising to deliver currency it did not have at the time.[2] Plaintiff's concern over the course of the pound was well-founded. A little more than a month after it signed the last of the four futures contract, the British Government devalued the pound from about $2.80 to about $2.40 per dollar. American Home then had four contracts enabling it to sell pounds in September and October 1968 at a rate considerably higher than the post-devaluation exchange rate.

As projected, taxpayer received very substantial dividends of sterling from its British subsidiaries. For relatively small dividends plaintiff exchanged the pounds into dollars at the lower post-devaluation exchange rate. However, plaintiff used most of the pounds received from these dividends to cover (partially) its obligation under two of the futures contracts with Continental. The procedure was this: After receiving advance notice of an impending dividend declaration, American Home would make arrangements with Continental to accept the pounds as an early delivery on the futures contracts: The bank was not contractually required to accept early delivery, and a separate agreement was reached for each one. Upon declaration of the dividend and requisite export clearance from British authorities, American Home ordered the subsidiary to pay the pounds directly to Continental. The latter in turn paid American Home an amount in dollars at approximately the contractually-mandated rate of $2.80 per pound. Although the precise time lag between declaration of a dividend in pounds and translation into dollars is not clear, we can assume it was done quickly. It is stipulated that American Home never held any pounds in its possession or subject to its control for greater than six months.

For federal income tax purposes, taxpayer valued its British dividends (and the British taxes paid thereon) at the contractual exchange rate of $2.80 per pound, producing a larger total dividend income than if the pound dividends were valued in dollars at the prevailing post-devaluation exchange rates.[3] The larger dividend value produced a net tax advantage to American Home under the foreign tax credit provisions of the Internal Revenue Code because the British income taxes (which were creditable under the tax credit provisions) were enlarged if translated at $2.80 rather than $2.40.[4]

On audit the Internal Revenue Service adopted the lower prevailing exchange rate to value the sterling dividends and the British taxes. The Service also characterized the exchange gain realized on the two futures contracts as ordinary income. These adjustments produced a substantial deficiency which taxpayer paid and for which it now seeks a refund.

2. *See, e.g., Wool Distributing Corp. v. Commissioner,* 34 T.C. 323, 328 n.1 (1960) ("A short sale of foreign currency obligates the seller to deliver a fixed amount of the foreign currency, at a specified date in the future, at a specified rate of exchange."); *International Flavors & Fragrances, Inc. v. Commissioner,* 62 T.C. 232, 233–34 (1974), *rev'd & remanded,* 524 F.2d 357 (2d Cir. 1975); Costello, *Tax Consequences of Speculation and Hedging in Foreign Currency Futures,* 28 Tax Law'y 221, 223 (1974) (hereinafter Costello, *Tax Consequences* ). *Cf.* 2 L. Loss, Securities Regulation 1230 (2d ed. 1961) (quoting Securities and Exchange Commission approved definition of short sale of security as (in part) "any sale of a security which the seller does not own.")

3. The difference between the futures contract rate and the regular exchange rate on the dates dividends were declared was very substantial, amounting to approximately $548,000. The parties have stipulated the normal exchange rate on the dates of dividend declaration, and no issue is presented as to the validity of that rate. *Cf. Durovic v. Commissioner,* 65 T.C. 480 (1975) (determining proper translation of foreign currency from among three different exchange rates).

4. The established rule, accepted by both sides, is that foreign taxes on foreign dividends are to be translated into dollars at the same exchange rate as the dividends. *Bon-Ami Co. v. Commissioner,* 39 B.T.A. 825 (1939).

Plaintiff assigned its two remaining futures contracts (one with Continental and the other with Manufacturers Hanover) to the Canadian Imperial Bank of Commerce. The assignment was made some two weeks before the delivery dates, and Canadian Imperial paid plaintiff about $336,000 for the two contracts. This sum was the difference between the contract rate (approximately $2.80 per pound) and the prevailing exchange rate in 1968 (about $2.40), adjusted for Canadian Imperial's commission expenses and interest charges. Both Continental and Manufacturers Hanover accepted the assignments. American Home and Canadian Imperial were completely independent companies at the time of assignment. The terms of both assignment agreements specify that American Home assigned all "right, title, and interest" in the futures contracts, and the agreement assigning the contract made with Manufacturer's Hanover specifically stated that the assignment was "without recourse."

Taxpayer characterized the $336,000 gain as a long term capital gain. The Service treated the gain as ordinary income,[5] producing a deficiency which was paid, and which plaintiff seeks to recover in the second part of this suit.

## I.

The first problem is whether the sterling dividends are properly valued at the regular exchange rate prevailing on the date of declaration (defendant's view) or whether the special contractual rate at which the pounds were actually converted controls (plaintiff's view).

The underlying rules form the common ground for this contest. Section 301(b) of the Internal Revenue Code states that the amount of dividends of property other than cash is determined (in this setting) by the fair market value of the property. I.R.C.

§ 301(b)(1)(C). For these purposes, moreover, foreign currency is deemed "property" other than cash. See 31 U.S.C. §§ 451–463 (1976) (defining "legal tender" of the United States); Gillin v. United States, 423 F.2d 309, 311, 191 Ct.Cl. 172, 177 (1970) (foreign currency frequently treated as "property or a commodity"); Costello, *Tax Impact of Currency Exchange Rate Fluctuations*, 26 Tax Law'y 399, 420 & n. 85 (1973) (cases consistently treat foreign currency as commodity) [hereinafter Costello, *Tax Impact*]; cf. I.R.C. § 317(a). And section 301(b)(3) requires that the fair market value of such property be determined "* * * as of the date of the distribution."[6]

None of this is overtly disputed. The clash narrows to the proper method of determining in this case the value of the dividends (and taxes) paid in British currency. Defendant rests on the proposition that fair market value of a foreign currency must be measured by the prevailing exchange rate (if one exists). Plaintiff, as we have suggested, parries that the prevailing rate is irrelevant in this case where the taxpayer made an actual conversion at a different rate under its futures contracts. We agree with defendant.

Where, as here, foreign currency regularly and normally exchanges at a "free" rate—unimpeded by blocking or other significant currency restrictions[7]—that rate necessarily measures the fair market value of the alien money at the time of conversion. This follows from the general test in tax law for fair market value as the price of exchange "between a willing buyer and a willing seller, neither being under any compulsion to buy or sell . . ." Treas.Reg. § 1.170–1(c)(1) (adopting test for measuring fair market value of property in charitable contribution); Treas.Reg. § 20.2031–1(b) (adopting test for measuring value of property includable in decedent's gross estate); see Jack Daniel Distillery v. United States,

---

5. Defendant does not now argue that the gain was ordinary income. Its position is confined to urging that the assignments must be characterized as short term (rather than long term) capital gain. There is, of course, no difference in monetary result.

6. See also note 4, supra.

7. There is no claim that any such restrictions existed (at the relevant time) on exchange of pounds for dollars.

379 F.2d 569, 574, 180 Ct.Cl. 308, 315–16 (1967) *quoted in Bankers Trust Co. v. United States*, 518 F.2d 1210, 1219, 207 Ct.Cl. 422, 437 (1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976); *Knapp King-Size Corp. v. United States*, 527 F.2d 1392, 1400 n.4, 208 Ct.Cl. 533, 548 n.4 (1975). Under this test, it is clear that no willing buyer would have purchased plaintiff's pounds at a price some $548,000 higher than the regular exchange rate, without the compulsion (as Continental had) of a futures contract.[8]

Similarly, taxpayer's $2.80 rate fails the test that the foreign dividend be given its fair market value at the time of distribution. Let us assume that American Home translated its pounds into dollars the same day as each dividend was declared.[9] Even so, the $2.80 rate was, as the facts show, clearly not the fair market value for those dates in late 1967 or in 1968, though it may have been for the pre-devaluation period earlier in 1967. Yet section 301(b)(3) and the implementing regulations require measurement of fair market value "as of the date of distribution." *See* Treas.Reg. § 1.301–1(b); *cf.* Rev.Rul. 74–230, 1974–1 Cum.Bull. 187, 188 (applying date of distribution rule for measuring dividends received from a controlled foreign corporation). Plaintiff seeks to circumvent this rule by asserting the earlier, by-passed, no-longer-effective value as if it were given current validity as fair market value merely by virtue of taxpayer's having made a special arrangement to keep it in effect for plaintiff's own transactions (though it would not be alive for others). Such an arrangement may have been satisfactory to American Home but it could not by fiat fix as current market value an amount which plainly was different from the prevailing value.

Nor can we accept American Home's contention that any actual conversion rate (such as plaintiff used here) must control over an acceptable general exchange rate. The statute and regulations speak in terms of fair market value and by definition that concept excludes the notion that a special bargain, out of line with the generality of the prevailing fair market value, can override. Currency exchanges provide no exception to this controlling principle. In *Cinelli v. Commissioner*, 502 F.2d 695, 698 (6th Cir. 1974), the court did suggest that an actual conversion would be the best method of determining fair market value of a foreign currency in that instance, but this statement was made in the context of evaluating Italian currency during World War II, when war conditions made use of an artificially official exchange rate useless, and precluded the existence of a standard commercial rate. The Sixth Circuit's opinion made clear that, absent such unique market conditions, it would adopt defendant's method—valuing foreign currency at the commercial exchange rate established by New York financial centers. *Id.* at 698–99.[10] Similarly, the two revenue rulings cited by plaintiff do not aid it. Rev.Rul. 64–307, 1964–2 Cum.Bull. 163, states that the rate of exchange at which a foreign currency is actually translated will control valuation but again the Ruling's context

---

**8.** Taxpayer did sell some smaller pound dividends, outside the futures contracts, at the prevailing exchange rate. This is indication enough that, without the compulsion of a futures contract, the pound dividends were worth considerably less than the rate now asserted by plaintiff.

**9.** It is not evident from the stipulation exactly when taxpayer translated the British dividends into U.S. dollars, *see supra.*

**10.** *Cinelli's* rejection of an official or commercial exchange rate, when formal or informal currency restrictions render such rates economically unreal, conforms with other cases.

*See, e.g., Cooper v. Commissioner*, 15 T.C. 757 (1950) (reviewed by the court) (official exchange rate inapplicable when currency removal blocked by wartime restrictions); *Oei Tjong Swan v. Commissioner*, 24 T.C. 829 (1955) (foreign securities not removable in wartime valued at rate lower than New York Stock Exchange rate); *Durovic v. Commissioner*, 65 T.C. 480 (1975) (supplemental opinion) (rejecting use of official rate where government-imposed currency restrictions existed). We note again that, at the time taxpayer's dividends were declared, there was no blocking or special restriction affecting British currency rates.

shows that this was said under the presumption that "actual conversion" reflected an economically normal rate. To emphasize that foreign currency must be translated at a rate reflecting economic realities the Ruling concludes that, even in restricted currency situations, such as *Cinelli, supra,* taxpayer must use "the rate of exchange that will most properly reflect his income." *Id.* at 1964–2 Cum.Bull. 163, 166. Here, the rate "most properly reflecting" taxpayer's income is the prevailing exchange rate. The second Revenue Ruling plaintiff relies on, Rev.Rul. 74–222, 1974–1 Cum.Bull. 21, also supports defendant by concluding that, when a single unchallenged exchange rate exists (as here), foreign currency must be translated into dollars at that effective exchange rate.

Finally, we reject plaintiff's contention that it should succeed because the receipt of the dividends and use of the futures contracts for conversion of the foreign money was in substance a single transaction, all carried out pursuant to a preconceived design, to collect the British dividends at what American Home believed to be their full and true dollar value. Even if we were to assume *arguendo* that this was so, it would make no difference. As we have already pointed out, the relevant parts of the Code and the regulations do not allow a taxpayer, in plaintiff's situation, to arrange for itself a special value, unrelated to the "free" fair market value of the foreign currency at the time of the dividend distribution. Under current tax law the existence of changes in the market value of foreign currency is a fact of life which cannot be ignored, even though the taxpayer's only objective is to protect the worth of its foreign income and it has no purpose or desire to speculate in foreign currency or to save on taxes.[11]

We add that we are not convinced on this record that taxpayer had the single, protective purpose it now asserts. The facts show

that: (1) there was no contractual arrangement in any of the futures contracts tying them to plaintiff's receipt of sterling dividends; (2) plaintiff did not automatically apply all of its dividends to the futures contracts; (3) at the end, plaintiff exercised its option to buy pounds on the open market and satisfy the residue of its contractual obligation for delivery of pounds; (4) as we discuss in Part II, *infra,* plaintiff sold two of its four futures contracts to a Canadian bank; and (5) the major advantage claimed by plaintiff for using its dividends to satisfy two of the futures contracts with Continental is a saving in the United States income tax. In the light of these facts, it is not easy to accept the point that the whole arrangement was solely for the purpose of protecting the expected British dividends against the ravages of devaluation.

We conclude that defendant properly measured taxpayer's sterling dividends (and the resulting British taxes) by the prevailing exchange rate on the date of distribution. As to that issue, plaintiff can obtain no refund.

## II.

The other aspect of the case concerns the characterization of taxpayer's gain on the assignment of two of its futures contracts to Canadian Imperial Bank—short term or long term capital gain.

A. *Bona fides of the assignment*: Defendant first asserts that American Home's purported assignment of the two contracts was not a bona fide assignment, but rather that Canadian Imperial acted as an agent or broker of taxpayer in making final settlement of the contracts by delivery of pounds to Manufacturers Hanover and Continental. Since direct delivery of pounds by American Home would result, defendant says, in short term capital gain

---

11. In the words of one commentator on the law as it now stands: Measures taken by these companies [U.S. companies buying forward currency contracts] in reaction to currency fluctuation, although intended to be defensive to protect corporate assets and earnings and not speculative to make profits, often produced economic profit or loss.

Costello, *Tax Impact, supra,* at 400.

under the provisions of I.R.C. section 1233,[12] defendant concludes that this transaction should also result in short term capital gain.[13] . We reject defendant's challenge, finding the assignment of the two futures contracts to be bona fide.

From all that appears taxpayer sold its futures contracts to Canadian Imperial—a complete transfer for consideration seems to have been effected. American Home ceded all "right, title, and interest" in the two futures contracts to Canadian Imperial by the terms of the assignment agreements. One agreement specifically stated the assignment was "without recourse," and there is no evidence that American Home retained any liability on the other assigned contract. It is stipulated that all parties to the transaction—American Home (assignor), Canadian Imperial (assignee), Continental Bank and Manufacturer's Hanover (original contracting parties)—are independent entities. No challenge is made to the sufficiency of the consideration paid by Canadian Imperial which had an extensive business in foreign currency exchange for its own account.

There is no reason to depart from that initial impression. *LaGrange v. Commissioner*, 26 T.C. 191 (1956), closely examined a purported sale of a foreign currency futures contract and concluded that the sale was not a valid economic transaction. *Id.* at 196–97. However, the "significant fact" which persuaded the Tax Court to disregard that sale was that the taxpayer remained fully liable on the futures contracts until the date of delivery. *Id.* at 197. Here, it is uncontested that American Home retained no liability on either contract.[14] Judge

Tannenwald concurring in the initial decision in *International Flavors & Fragrances v. Commissioner*, 62 T.C. 232 (1974), *rev'd* 524 F.2d 357 (2d Cir. 1975), also scrutinized a purported sale of foreign currency futures contracts and inferred that the taxpayer-assignor had prearranged for the assignee to make an immediate purchase of the foreign currency in settlement of the contract. 62 T.C. at 240–43. In the present case, there is no such inference from the timing of the transaction or the relationship of the parties that American Home made any prearrangements for the ultimate settlement of the contracts by Canadian Imperial, and American Home has submitted an uncontested affidavit by its corporate treasurer disavowing any such advance arrangements. Judge Tannenwald posits a hypothetical situation—resulting in a finding of good faith—if the taxpayer in *International Flavors* had left the assignee with the discretion whether to resell the contracts, immediately buy foreign currency, or await the delivery date before covering. *Id.* at 242–43. Here, Canadian Imperial did have such discretion, the same discretion that persuaded the Tax Court on remand that the sale in *International Flavors* was in fact bona fide. *See International Flavors & Fragrances, Inc. v. Commissioner*, T.C.M. (P–H) ¶ 77,058 (1977) (supplemental opinion on remand); *see generally* Costello, *Tax Consequences, supra,* at 236.

Defendant also notes other factors which it asks us to take into account as showing that Canadian Imperial was merely taxpayer's agent or broker. The total consideration paid by Canadian Imperial in effect gave that bank credit for commission fees

---

12. The precise application of § 1233 to short sales of foreign currency is analyzed in Part II–B, *infra.*

13. Defendant might also be relying on section 1222(1). By treating the assignment as a mere cover for actual purchase of pounds (or an offsetting purchase contract) taxpayer would be left holding a capital asset (pounds or the offsetting contract) for less than six months. *Cf. International Flavor & Fragrances, Inc. v. Commissioner,* 62 T.C. 232, 240–43 (1974) (Tannenwald, J., concurring), *rev'd,* 524 F.2d 357 (2d Cir. 1975). Whatever theory defendant

relies on, the present argument presumes that the assignment was invalid as not made in good faith.

14. The Court in *LaGrange* was also persuaded by the fact that the assignee in that case, a well-known brokerage house, made no profit on the contract and testified that it accepted assignment only to retain the goodwill of Mr. LaGrange, an important customer. *Id.* at 197. In these respects, too, the facts of this case differ significantly from the *LaGrange* transaction.

for clearing the futures contracts and also for interest on the amount paid by the Canadian bank for the period between the assignment and the delivery dates on the futures contracts. But these facts do not outbalance the others which tend to show the genuine character of the assignment— in the entire context the facts on which defendant relies show no more than that Canadian Imperial wanted to minimize its risk of loss on the whole transaction (though it was not at all averse to making a profit, if possible). Defendant points out, too, that the futures contracts were assigned only two weeks before the ultimate delivery date and suggests that therefore Canadian Imperial's remaining risk (from further currency fluctuations between assignment and delivery date) was minimal. But we cannot say, on this record, that the Canadian bank's risk was miniscule or nonexistent or that in any event the possibility of its making a profit on currency exchanges during that fortnight was likewise null or outside the parties' contemplation (we may legitimately assume that Canadian Imperial was a skilled operator in that field).

That American Home may have had tax consequences in mind when it made the assignment is clearly beside the point. It is fundamental that once a taxpayer properly enters a bona fide transaction the mere fact that the transaction legally reduces taxes is irrelevant. A taxpayer has the option to select a transaction which will legally minimize taxes. *See, e.g., Gregory v. Helvering,* 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935); *Hilton v. Commissioner,* 13 T.C. 623, 630 (1949); *International Flavors & Fragrances, Inc. v. Commissioner,* T.C.M. (P–H) ¶ 77,058, at 260 and cases cited (1977).

With the conclusion that taxpayer's assignment was a bona fide "sale" of foreign currency futures contracts (which are capital assets in taxpayer's hands) [15] the normal result would be a long-term capital gain, since the futures contracts were admittedly held for more than six months. *See* I.R.C. § 1222(3) (defining long term capital gain).

■■■ B. *Section 1233(b)*: The Government's alternative assault on the assignment to the Canadian bank invokes the special rule on capital gains from short sales under section 1233(b).[16] In discussing this

---

**15.** Defendant does not contest the proposition that both foreign currency and futures contracts for foreign currency can be capital assets, and that (aside from the challenge to bona fides and the impact of section 1233(b)) the foreign currency futures contracts in this case were capital assets. Courts and the IRS have treated foreign currency (when used for speculation, as here) as a capital asset. *See, e.g., KVP Sutherland Paper Co. v. United States,* 344 F.2d 377, 379, 170 Ct.Cl. 215, 219–20 (1965); *Gillin v. United States,* 423 F.2d 309, 312, 191 Ct.Cl. 172, 179 (1970); Rev.Rul. 74–7, 1974–1 Cum.Bull. 198. Foreign currency futures represent the same type of risk as foreign currency held for speculation, and a series of Tax Court cases have assumed such futures contracts can be capital assets. *See, e.g., International Flavors & Fragrances, Inc. v. Commissioner,* 62 T.C. 232, 237–38 (1974); *Wool Distributing Corp. v. Commissioner,* 34 T.C. 323, 330 (1960); *LaGrange v. Commissioner,* 26 T.C. 191, 196 (1956). *See generally,* D. Ravenscroft, Taxation and Foreign Currency, 221 (1973) [hereinafter D. Ravenscroft]; Dale, *Tax Consequences of Currency Fluctuations: Occasional Transactions,* 32 N.Y.U. Institute on Federal Taxation 1683, 1695 (1974).

**16.** The pertinent portions of section 1233 read as follows:

§ 1233. Gains and losses from short sales.
(a) Capital assets.

For purposes of this subtitle, gain or loss from the short sale of property shall be considered as gain or loss from the sale or exchange of a capital asset to the extent that the property, including a commodity future, used to close the short sale constitutes a capital asset in the hands of the taxpayer.
(b) Short-term gains and holding periods.

If gain or loss from a short sale is considered as gain or loss from the sale or exchange of a capital asset under subsection (a) and if on the date of such short sale substantially identical property has been held by the taxpayer for not more than 6 months (determined without regard to the effect, under paragraph (2) of this subsection, of such short sale on the holding period), or if substantially identical property is acquired by the taxpayer after such short sale and on or before the date of the closing thereof—

(1) any gain on the closing of such short sale shall be considered as a gain on the sale or exchange of a capital asset held for not more than 6 months (notwithstanding the

contention we assume arguendo (but without deciding) that a foreign currency futures contract is a "commodity future."[17]

Even on that assumption, section 1233(b) is inapplicable by its terms to the transaction before us because taxpayer never held "substantially identical property" at or after the short sale—an essential precondition of section 1233(b). Those are the very terms of the statute, and its legislative background is in accord. The provision is predicated on a taxpayer's holding property "substantially identical" to the property described in the short sale contract. See H.R. Rep.No.2319, 81st Cong., 2d Sess. at 94–96 (1950) (rules of predecessor provision to section 1233 applicable "whenever property substantially identical to that sold short has been held by the taxpayer [for the applicable period]"); 94 Cong.Rec. 9207 (remarks of Rep. Knutson) ("The new provisions will apply only when substantially identical property is owned by the taxpayer.") In the case of commodity futures, the history

states that substantially identical property would be an offsetting purchase contract for the same commodity covered by a future sales contract. See H.R.Rep.No.2319, 81st Cong., 2d Sess. 55–56 (1950).[18] Moreover, section 1233(e)(2)(B) sets out a specific clarification of the "substantially identical property" rule for commodity futures contracts for different months. This reinforces the view that the requirement of holding "substantially identical property" is an essential part of the statutory scheme. It could be that acquisition of the underlying commodity—in this case pounds sterling—would also provide the "substantially identical property" under section 1233(b). See Costello, Tax Consequences, supra at 226–28. Here, however, taxpayer never acquired any "substantially identical property," but simply assigned the futures contracts.

Defendant argues that, because the assignment was made only two weeks before

period of time any property used to close such short sale has been held); and

(2) the holding period of such substantially identical property shall be considered to begin (notwithstanding section 1223, relating to the holding period of property) on the date of the closing of the short sale, or on the date of a sale, gift, or other disposition of such property, whichever date occurs first. This paragraph shall apply to such substantially identical property in the order of the dates of the acquisition of such property, but only to so much of such property as does not exceed the quantity sold short.

For purposes of this subsection, the acquisition of an option to sell property at a fixed price shall be considered as a short sale, and the exercise or failure to exercise such option shall be considered as a closing of such short sale.

\* \* \* \* \* \*

(e) Rules for application of section.

(1) Subsection (b)(1) or (d) shall not apply to the gain or loss, respectively, on any quantity of property used to close such short sale which is in excess of the quantity of the substantially identical property referred to in the applicable subsection.

(2) For purposes of subsections (b) and (d)—

(A) the term "property" includes only stocks and securities (including stocks and securities dealt with on a "when issued" basis), and commodity futures, which are capital assets in the hands of the taxpayer;

\* \* \* \* \* \*

17. Section 1233(e)(2)(A) [n.16, supra] limits the application of section 1233(b) to "stocks and securities and commodity futures." Whether a foreign currency (or a currency futures contract) falls within any of these three classifications is, as Judge Feinberg observed, "a proposition which is open to question." International Flavors & Fragrances, Inc. v. Commissioner, 524 F.2d 357, 359 & n.3 (2d Cir. 1975). Compare Costello, Tax Consequences, supra at 225–28 (arguing foreign currency future should be considered "commodity future"); D. Ravenscroft, supra note 11, at 228 (same); with Henrey, Economic and Tax Aspects of Foreign Exchange Futures Contracts, 31 N.Y.U. Institute on Federal Taxation 645, 659–60 (1973) (doubting that foreign currency is included in 1233(e) categories); Duncan, Lowering the value of the dollar raises certain tax problems. 37 J. Taxation 115, 117 (1972) (expressing similar doubts).

18. This is the report discussing the predecessor section to 1233, section 117(1) of the 1939 Code. The report's language also describes the purposes of section 1233 because Congress in 1954 adopted the bulk of section 117(1) without changes relevant to this case. See H.R.Rep.No. 1337, 83d Cong., 2d Sess. A277–A278, reprinted in [1954] U.S.Code Cong. & Admin.News pp. 4017, 4419–20.

the delivery date, the assignment is equivalent to a direct purchase of pounds (which, as we have just said, might satisfy the "substantially identical property" requirement). We are not persuaded by this attempt to equate the assignment with a purchase and delivery of the underlying commodity. First, as discussed in Part II–A, *supra*, the assignment itself was a bona fide transaction. Second, we cannot conclude, as defendant infers, that although bona fide, the assignment within two weeks of the closing date was essentially equivalent to a purchase and delivery of pounds by American Home. Canadian Imperial, as we have emphasized, is a regular dealer in forward exchange contracts, and may well have hoped to gain additional profits through currency fluctuations in the remaining two weeks. To label the assignment as merely a cover for the purchase and closing delivery of pounds (by taxpayer) would ignore the economic role of an independent and sophisticated party.[19] Unlike *LaGrange, supra,* note 14, here no evidence suggests that Canadian Imperial agreed to the assignment simply to accommodate American Home's tax designs.

We are left with defendant's last stand—that section 1233(b) should be applied by analogy or "in principle." To shore up this position, defendant invokes a piece of legislative history dealing with "when-issued" stocks or securities.[20] The House Committee Report states that: "* * * the entry into a contract to sell such stocks or securities 'when issued' shall be considered as a short sale and the performance of such contract *or the assignment thereof for value shall be considered as a closing of such short sale.*" *H.R.Rep.No.2319, 81st Cong., 2d Sess. 95 (1950) (emphasis per defendant's brief.)* See also *S.Rep.No.2375, 81st Cong., 2d Sess. 87 (1950).* The Government notes that the assignment of foreign currency futures is analogous to the assignment of "when-issued" stock, and concludes that therefore section 1233(b) should apply by analogy. However suggestive this analogy might be for new legislation (or possibly regulation), we cannot accept it for this case. Application by analogy of this very specific, detailed and intricately interwoven tax statute is inappropriate. Section 1233 of the Internal Revenue Code is unlike the broad general provisions of (for example) the Constitution, the Sherman Act, or rule 10b–5 of the Securities Exchange Act which courts have liberally interpreted. *Cf. Martin v. Hunter's Lessee,* 14 U.S. (1 Wheaton) 304, 326, 4 L.Ed. 97 (1816); *National Society of Professional Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The very specificity and narrow coverage of section 1233 suggests that unlike broad legislation —perhaps even broad tax provisions—a court should be hesitant to extend by analogy this statute well beyond anything its own text can fairly carry. Moreover, ignoring in these circumstances the explicit requirement of holding "substantially identical property" could create perturbations for other parts of the statute which we are now unable to foresee and evaluate. Finally, defendant's analogy is based not on some express words in the statute itself, covering assignment of when-issued securities, but solely on the words of the Committee reports. That seems to us a weak foundation for the current argument—a foundation twice removed from the text of section 1233.[21]

---

**19.** The Tax Court, when faced with an analogous argument in the context of a charitable assignment of foreign currency futures, concluded:

> Prior to the maturity date [of the futures contracts], a revaluation of the pound or the dollar could have erased or lessened the potential gain, or even caused losses. Thus, the amount of the gain, if any, was not assured and was most certainly not "in the bag" as asserted by respondent.

*S. C. Johnson & Son, Inc. v. Commissioner,* 63 T.C. 778, 787 (1975).

**20.** "When-issued" stock provides the holder the right to acquire new stock resulting from a corporate reorganization "when, as, and if" such new stock is issued. *See Haynes v. Commissioner,* 17 T.C. 772, 773–74 (1951); I.T. 3721, 1945 Cum.Bull. 164.

We conclude that as to the treatment of taxpayer's dividends declared in pounds sterling (Part I, *supra*) defendant is entitled to summary judgment; to that extent the plaintiff's motion is denied and the petition is dismissed. Plaintiff prevails on the issue relating to long term capital gain on the two contracts assigned to Canadian Imperial Bank (Part II, *supra*);[22] on that aspect of the case the defendant's motion for summary judgment is denied, the plaintiff's is granted, and judgment is entered in favor of the latter. The case is remanded to the Trial Division under Rule 131(c) for a computation of the amount to be refunded.

21. We do not mean to pass (in any way) on the application of the statute to assignments of when-issued stock. We merely note our reluctance to analogize beyond the terms of the statute when the basis of the analogy is found solely in a portion of Committee reports dealing with another subject than the one now before us.

It may be that a statutory disparity (or loophole) exists between treatment of assignments of when-issued stock and assignments of short sales in foreign currency. If so, we repeat what we said in another case involving the tax consequences of foreign exchange transactions:

"But, if so, the gap is inherent in the Code as it now stands, and must await any necessary correction by Congress or, perhaps, the Treasury." *Gillin v. United States,* 423 F.2d 309, 313 n.8, 191 Ct.Cl. 172, 179 n.8 (1970).

22. In a decision brought to our attention after this opinion was prepared, the Tax Court also accepted long term capital gain treatment for a forward currency contract held longer than six months and then assigned by the taxpayer. *Hoover Co. v. Commissioner,* 72 T.C. No. 18, slip op. at 80 (Nos. 2697–77, 9646–77, April 24, 1979) (reviewed by the court).