THE CARBORUNDUM COMPANY, A DELAWARE CORPORATION, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2338–75.[1]    Filed July 21, 1980.

*Dennis I. Meyer* and *C. David Swenson,* for the petitioner.
*Sommers T. Brown* and *Raymond W. McKee,* for the respondent.

WILES, *Judge:* Respondent determined a deficiency of $229,049 in petitioner's 1968 Federal income tax. The sole issue for decision is whether petitioner realized short-term or long-term capital gain from the sale of foreign currency contracts.

FINDINGS OF FACT

This case has been fully stipulated and the facts are found accordingly.

The Carborundum Co. (hereinafter petitioner) is a corporation organized and existing under the laws of the State of Delaware with its principal offices located at Niagara Falls, N.Y. Petitioner filed a timely consolidated Federal income tax return for

---

[1]Subsequent to trial on the depletion issue in docket Nos. 7289–74, 2338–75, 2339–75 (70 T.C. 59), petitioner amended its petition in docket No. 2338–75 and raised the currency contract issue addressed in this opinion. Since the depletion issue had been fully tried and briefed, the currency contract issue was severed from docket No. 2338–75 for separate trial and briefing by order dated Oct. 17, 1977. By order dated May 9, 1978, proceedings under Rule 155, Tax Court Rules of Practice and Procedure, for entry of decisions in docket Nos. 7289–74 and 2339–75 were held in abeyance pending resolution of the currency contract issue in docket No. 2338–75.

calendar year 1968 with the District Director of Internal Revenue, Buffalo, N.Y. Petitioner maintained its books and records and filed its return for the year at issue on the accrual method of accounting.

Petitioner is engaged directly and through subsidiaries in the manufacture and sale of a diversified line of abrasive materials and machines, refractory materials and other nonmetallic materials, as well as pollution control equipment. Petitioner has a wholly owned subsidiary incorporated under the laws of the United Kingdom, the Carborundum Co., Ltd. (hereinafter Carborundum, Ltd.), which is located in Manchester, England, and is engaged in the same type of manufacturing activities as petitioner.

In 1967, the current assets of Carborundum, Ltd., exceeded its current liabilities. Petitioner, nonetheless, was concerned that a devaluation of the British pound sterling would adversely affect the working capital of Carborundum, Ltd., and thereby petitioner's consolidated financial statements. In the event of such a devaluation, the current assets and current liabilities of Carborundum, Ltd., would be converted to dollars at a lower rate, and the rate difference would, except as to intercompany accounts, produce a charge against income in the form of a currency loss on the worldwide consolidated financial statements of petitioner.

To protect against such a conversion loss, a corporation can enter into a contract, commonly known as a "forward contract," under which it agrees to deliver a stated amount of currency (in this instance, British pounds sterling) on a specified date in the future, at a specified rate of exchange. On the date specified, the contract may be closed by delivering the foreign currency and receiving the contract price thereof, or by receiving or paying the difference between the contract price and the current market value of the currency.

In 1967, petitioner entered into two separate and independent forward-sales contracts to protect itself against a charge on its consolidated worldwide financial statements for 1967 and subsequent years by reason of an anticipated devaluation of the British pound sterling. The first of these contracts was entered into with Brown Bros. Harriman & Co. (hereinafter Brown Bros.) on July 31, 1967 (hereinafter referred to as the Brown Bros. contract). The second of these contracts was entered into

with First National City Bank (hereinafter Citibank) on October 23, 1967 (hereinafter referred to as the Citibank contract). The British pound sterling was devalued on November 18, 1967, from U.S. $2.80 per pound to U.S. $2.40 per pound.

Under the terms of the Brown Bros. contract, petitioner sold to Brown Bros. 1 million British pounds sterling at the rate of U.S. $2.7775, delivery and payment to be made on February 2, 1968. Before the maturity date of the Brown Bros. contract on February 2, 1968, petitioner contacted Brown Bros. for the purpose of effecting a transfer of the Brown Bros. contract to a third party prior to such maturity date. Brown Bros. ascertained that Citibank would buy the Brown Bros. contract and so advised petitioner.

On February 1, 1968, petitioner sold the Brown Bros. contract to Citibank and was thereafter relieved of all of its rights, duties, and obligations to Brown Bros. under that contract. The exchange rate for British pounds sterling on that date was U.S. $2.4133.

When petitioner sold the Brown Bros. contract to Citibank, petitioner expected Citibank to close the contract on the following day, February 2, 1968. On February 1, 1968, the date of the transfer of the Brown Bros. contract to Citibank, Brown Bros., having consented to this transfer, was aware not only that Citibank would close the contract on February 2, 1968, but also that it could look only to Citibank to close the contract on that date.

On October 23, 1967, petitioner entered into a similar forward contract with Citibank, pursuant to which petitioner sold to Citibank 1 million British pounds sterling at the rate of U.S. $2.7704, delivery and payment to be made on April 26, 1968. Shortly before the maturity date of the Citibank contract on April 26, 1968, petitioner contacted Citibank for the purpose of effecting a transfer of the Citibank contract to a third party prior to such maturity date.

On April 25, 1968, petitioner sold the Citibank contract to Brown Bros. and was thereafter relieved of all of its rights, duties, and obligations to Citibank under that contract. The exchange rate for pounds sterling on such date was U.S. $2.3995.

When petitioner sold the Citibank contract to Brown Bros., Citibank, having consented to this transfer, was aware not only that Brown Bros. would close the contract on April 26, 1968, but

also that it could look only to Brown Bros. to close the contract on that date.

Petitioner did not own any British pounds sterling at the time either contract was entered, during the time the contracts were held, or at the time either contract was sold, nor did it own any contract rights to acquire British pounds sterling which could have been used to satisfy its obligations under the forward contracts. At the time of sale, petitioner had held both contracts for more than 6 months. On its 1968 corporate income tax return, petitioner reported as long-term capital gain its gain of $364,139.30 on the sale of the Brown Bros. contract and its gain of $370,400 on the sale of the Citibank contract.

## OPINION

We must decide whether petitioner realized short-term or long-term capital gain from the sales of the Brown Bros. and Citibank foreign-currency contracts (hereinafter referred to as the currency contracts). The parties agree that the currency contracts were capital assets in the hands of petitioner,[2] and that the transfers were bona fide sales in that all the risks attributed to ownership of the currency contracts shifted from petitioner to the purchasers of such contracts.

Petitioner maintains that the currency contracts, capial assets within the meaning of section 1221,[3] were transferred pursuant to a "sale or exchange" after being held for more than 6 months as provided by section 1222(3),[4] and, therefore, the gain realized from such transfers is long-term capital gain. Respondent, on the other hand, claims that the gain realized from the transfers is short-term capital gain on the basis of two independent arguments. Respondent first argues that the sale of each currency contract effected the closing of a short sale for purposes of section 1233 in that, as a result of such sales,

---

[2]In *International Flavors & Fragrances, Inc. v. Commissioner*, T.C. Memo. 1977–58, and *Hoover Co. v. Commissioner*, 72 T.C. 206 (1979), this Court decided that forward-sales contracts for the delivery of foreign currency, like those at issue in the instant case, were capital assets in the hands of the respective taxpayers.

[3]All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[4]In 1968, the taxable year before us, sec. 1222(3) provided for a holding period requirement of "more than 6 months" for long-term capital gain treatment. The requirement under current law is "more than 1 year."

petitioner received substantially identical property for purposes of section 1233(b). Respondent next argues the application of the assignment-of-income doctrine in that the sale of each currency contract represented a sale of a short-sale contract containing a right to receive short-term capital gain under section 1233. For reasons set out below, we find respondent's arguments unpersuasive and hold for petitioner.

## I  *Short-Sales Argument*

Respondent's first argument is based on section 1233 which prescribes the income tax consequences of gains and losses from "short sales" of certain types of property. Although the term "short sale" is not defined in the Code or the applicable Income Tax Regulations, it generally refers to the sale of property that one does not own, but expects to purchase and deliver in the future. Section 1233 is primarily concerned with short sales involving property constituting stocks, securities, and commodity futures. Sec. 1233(e)(2)(A).

Gain or loss on a short sale is generally not recognized until the transaction is "closed." Section 1.1233–1(a)(1), Income Tax Regs., provides that, for income tax purposes, a short sale is not deemed consummated or "closed" until delivery of the property to close the short sale. Whether the gain or loss recognized from a "closed" short sale is capital or ordinary gain or loss depends upon whether the property, so delivered, constituted a capital asset in the hands of the taxpayer. Sec. 1233(a); sec. 1.1233–1(a)(1), Income Tax Regs.

The characterization of gain or loss as long-term or short-term generally depends upon the period the taxpayer held the property delivered to close a short sale. Sec. 1222. Section 1233, however, provides several special rules for determining the long- or short-term character of gain or loss from short sales, regardless of the length of time such property was held by taxpayer. Sec. 1233(b), (d).

More specifically, section 1233(a) provides that gain or loss from the short sale of property shall be considered as gain or loss from the sale or exchange of a capital asset to the extent that the property, including a commodity future, used to close the short sale constitutes a capital asset in the hands of a taxpayer. Thus, the basic rule of section 1233 is that gain or loss from a

short sale of property is considered capital gain or loss if the property used to close the short sale constituted a capital asset.

The special rules for determining the long- or short-term character of gain from short sales are contained in section 1233(b).[5] Section 1233(b) provides that if substantially identical property to that sold short has been held by the seller for not more than 6 months on the date of the short sale and prior to the closing, two special short-sales rules apply. First, gain realized upon the closing of a short sale is characterized as short-term capital gain, regardless of when the property used to close the short sale was actually acquired. Second, the holding period of substantially identical property, acquired not more than 6 months prior to the short sale or acquired after the short sale and before the closing, is considered to begin on the earlier of either the date of the closing of the short sale or the date of sale of such substantially identical property. The purpose of these rules is to prevent the conversion of short-term gain into long-term gain through manipulation of the holding period rules under section 1223 by selling property "short."

Before applying the two above-described rules, however, certain prerequisites must be satisfied. The term "property" as used in section 1233(b) is defined to include only stocks and securities (including stocks and securities dealt with on a "when issued" basis), and commodity futures, which are capital assets in the hands of the taxpayer. Sec. 1233(e)(2)(A). Therefore, the special rules of section 1233(b) have no application unless the property sold short and the substantially identical property held by the taxpayer is either stock, securities, or commodity futures.

Furthermore, "substantially identical property" to that sold short must have been held for not more than 6 months on the date of the short sale,[6] or such property must have been acquired by the seller after the date of the short sale and prior to the closing date. As a result, if a seller does not hold "substantially identical property" for the requisite period of time, section 1233(b) is not applicable.

---

[5] Since the instant case involves only realized gain, the sec. 1233 rules concerning the characterization of loss on the closing of a short sale will not be discussed any further herein.

[6] In 1968, the taxable year before us, sec. 1233(b), like sec. 1222(3), provided for a holding period requirement of "more than 6 months" for long-term capital gain treatment. Both sections currently provide for a holding period of "more than 1 year."

Respondent contends that since the currency contracts were sold just prior to the applicable delivery date of such contracts, and the purchasers assumed petitioner's obligation to deliver the currency, the transfers were equivalent to a direct purchase of British pounds sterling by petitioner, thereby satisfying the "substantially identical property" requirement of section 1233(b). In other words, respondent claims that if petitioner had contracted to purchase British pounds sterling just prior to the closing of each currency contract, instead of selling each currency contract just prior to its closing, petitioner would have achieved the same economic result, though the gain realized would clearly have been short-term capital gain. The Court of Claims in *American Home Products Corp. v. United States*, 220 Ct. Cl. ___ , 601 F.2d 540 (1979) (hereinafter *American Home*), considered this argument made with respect to facts essentially the same as the facts in the instant case and rejected it. For the following reasons, we, too, reject it.

In making his argument, respondent seems to suggest that the currency contracts were in fact commodity futures. Hence, in addressing respondent's argument, we assume, arguendo, but without deciding, that the currency contracts were commodity futures. Even on that assumption, however, we are unable to apply the special rules of section 1233 to the short sales at issue because petitioner never held "substantially identical property" at or after the time of such sales.

The statutory language of section 1233(b) specifically requires that the taxpayer hold "substantially identical property" at or after the short sale. In addition, the legislative history of section 1233 supports the proposition that the acquisition of "substantially identical property" is an essential precondition to the application of section 1233(b). In considering the predecessor to section 1233, Congress noted that such section is fundamentally predicated on the taxpayer's holding "substantially identical property."[7] Moreover, section 1233(e)(2)(B) sets forth a specific clarification of the "substantially identical property" rule for commodity futures contracts that involve different months. This reinforces the view that Congress intended the requirement of

[7]See H. Rept. 2319, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 421–422, 447–448.

holding "substantially identical property" to be an essential part of the statutory scheme.

Neither the Code, nor the regulations, nor the legislative history defines the term "substantially identical property." As to commodity futures, however, the legislative history indicates that "substantially identical property" would be an offsetting purchase contract for the same commodity to be delivered in the same month as the commodity covered by the forward-sale contract.[8] Thus, in the instant case "substantially identical property" to the currency contracts at issue would be either offsetting forward-purchase contracts for the delivery of British pounds sterling or British pounds sterling itself. See sec. 1.1233–1(d), Income Tax Regs.

During the period of time relevant for the operation of section 1233, petitioner never acquired, held, or entered into an offsetting forward-purchase contract for British pounds sterling. Indeed, petitioner never even held British pounds sterling or any other property which could be termed substantially identical to the currency contracts. Cf. *Hoover Co. v. Commissioner*, 72 T.C. 206 (1979). Rather, petitioner simply sold the currency contracts to independent third parties.

Furthermore, we must reject respondent's contention that the purchaser's assumption of petitioner's obligation to perform under the currency contracts is "substantially identical" to petitioner, itself, acquiring offsetting forward-purchase contracts or British pounds sterling. Petitioner sold the contracts to independent and sophisticated banking institutions, regularly dealing in forward-sales contracts for the delivery of foreign currency. Respondent concedes that these sales were bona fide transactions in that all risk of loss shifted from petitioner to the purchasers of such contracts.[9] Cf. *LaGrange v. Commissioner*, 26 T.C. 191 (1956). To treat the sales of petitioner's currency contracts as essentially equivalent to a purchase and delivery of pounds would be to label the sales as merely a cover and to ignore the economic role of independent and sophisticated third

---

[8]See H. Rept. 2319, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 422.

[9]The bona fide sales herein are clearly distinguishable from a transaction wherein the purported purchaser is merely acting on behalf of the purported seller in purchasing the foreign currency underlying a contract. See *International Flavors & Fragrances, Inc. v. Commissioner*, 62 T.C. 232, 240 (1974).

parties. *American Home, supra* at 550. Moreover, we refuse to ignore the requirement of holding "substantially identical property," a key element to the operation of section 1233.

Respondent also argues that the currency contracts are analogous to the assignment of "when issued" stock covered by section 1233(b).[10] In support of this argument, respondent refers to S. Rept. 2375, 81st Cong., 2d Sess. 87 (1950), 1950–2 C.B. 545, which states: "In the case of transactions in stocks or other securities on a "when issued" basis, the entry into a contract to sell such stocks or securities "when issued" shall be considered as a short sale and the performance of such contract or the assignment thereof for value shall be considered as a closing of such short sale." See also H. Rept. 2319, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 448. On the basis of this passage from the committee reports, respondent submits that Congress intended section 1233(a) to cover any sale of a contract, not just one for stock and securities.

Again, in view that the "substantially identical property" requirement is a key element to the operation of section 1233, we believe respondent's argument strains the meaning of that term. In our opinion, currency contracts and "when issued" securities are not "substantially identical" as is required for the operation of section 1233. Since section 1233 is a very specific, detailed, and intricately interwoven statute, extending it by analogy is unwarranted. *American Home, supra* at 550. Therefore, we must conclude that since petitioner never held "substantially identical property," section 1233(b) cannot be applied to the sale of petitioner's currency contracts.

## II. *Assignment-of-Income Argument*

Respondent's second argument that the gain petitioner realized on the sales of the currency contracts was short-term capital gain is based on the application of the assignment-of-income doctrine. Under this doctrine, respondent argues that the sale of each currency contract in essence represented a sale of a short-sale contract, containing a right to receive short-term capital gain already earned in an "economic sense" under section 1233.

---

[10]"When issued" stock provides the holder the right to acquire new stock resulting from a corporate reorganization "when, as, and if" such new stock is issued. *Haynes v. Commissioner*, 17 T.C. 772, 773–774 (1951).

Thus, according to respondent, the assignment-of-income doctrine mandates that the gain petitioner realized be treated as short-term capital gain.

Petitioner rebuts by arguing that since the currency contracts were sold prior to maturity, it had no fixed right to earned income when the contracts were sold, and, therefore, the assignment-of-income doctrine cannot be applied. On the basis of our decision in *S. C. Johnson & Son, Inc. v. Commissioner*, 63 T.C. 778 (1975), we agree with petitioner and thereby reject respondent's argument.

In *Johnson*, the Johnson Wax Co. (hereinafter JWC) had entered two contracts in July 1967 with two New York City banks for the sale of 1,500,000 British pounds sterling, delivery and payment to be made in July 1968. JWC entered the contracts for reasons similar to those of petitioner, i.e., to protect itself against possible adverse economic consequences resulting from the potential devaluation of the pound sterling. Following the devaluation of the pound sterling, JWC assigned the contracts to a close affiliate, a charitable foundation, the Johnson Wax Fund, Inc. (the fund). The trustees of the fund were also officers and directors of JWC. The fund, upon approval of the assignments by the banks, promptly sold the contracts to a New York City investment firm.

JWC claimed a charitable deduction in 1968 equal to the value of the contracts as of the date of the contribution. The Commissioner argued that since the contracts had appreciated in value prior to their assignment to the fund, the gain from the contracts was not only "in the bag" but was readily available in that JWC could have closed the contracts and realized the potential income at any time by simply acquiring the pounds sterling necessary for delivery. Hence, the Commissioner argued that the income was earned before the transfer of the contracts and the application of the assignment-of-income doctrine required JWC to realize gain on the transfers.

This Court held, as a matter of law, there was no merit to the Commissioner's contention that the transfer of the contracts to the Fund was an assignment of earned income. We noted that gain derived from property is not "earned" until an event occurs with respect to that property which creates a right to that income. Moreover, a fixed right to the income did not exist at the time of the assignment because JWC had no right to any gain

whatsoever under the contracts until the pounds were delivered to the banks on the delivery date. We further noted that: "Prior to such delivery, petitioner certainly expected to realize a gain on closing the contracts. But unless and until the pounds were delivered, petitioner had no right to any income." *S. C. Johnson & Son, Inc. v. Commissioner, supra* at 786.

Petitioner clearly had no more of a fixed right to earned income at the time of the sales of the currency contracts than did the taxpayer in *Johnson*. As we noted in *Johnson*, such right does not arise until the foreign currency is delivered to the banks.[11] The mere anticipation or expectation of income by petitioner, no matter how well founded, is insufficient to give rise to a fixed right to earned income.

In comparing *Johnson* to the instant case, we believe petitioner has a considerably stronger case because independent parties are involved in each transaction. There is absolutely no basis upon which to infer an agency relationship between the parties or to assume the purchasers of the currency contracts were acting in concert with petitioner. Further, respondent agrees that no agency relationship existed between the parties.

Respondent attempts to distinguish *Johnson* on the ground that the sales in the instant case were made 1 day, rather than almost 4 months, before the maturity dates on the contracts. Respondent claims accordingly that petitioner should be treated as having earned income in an "economic sense," equal to the amount received from the purchasers of the contracts.

*Johnson* cannot be distinguished on such grounds since the gain in the instant case was no more earned in an "economic sense" than the gain in *Johnson*. Petitioner, though closer to realizing gain on the currency contracts than the taxpayer in *Johnson*, still had no fixed right to income at the time the contracts were sold. See *Beard v. Commissioner*, 4 T.C. 756 (1945); *Hobby v. Commissioner*, 2 T.C. 980 (1943). While the contracts had obviously appreciated in value prior to sale, the fixed right to the realization of such appreciation did not arise until after the sale when the foreign currency could be delivered to the banks. Moreover, prior to the time of delivery, the

---

[11]See sec. 1.1233–1(a)(1), Income Tax Regs., which states that: "For income tax purposes, a short sale is not deemed to be consummated until delivery of property to close the short sale." See also *LaGrange v. Commissioner*, 26 T.C. 191, 197 (1956).

economic risk, however small, remained on petitioner until the contracts were sold to independent third parties. Furthermore, income earned in an "economic sense" due to appreciation in value is, as noted above, insufficient to give rise to a fixed right to earned income under the assignment-of-income doctrine.

Respondent also attempts to distinguish the instant case from *Johnson* on the ground that the taxpayer in *Johnson* received no money on the assignment, whereas petitioner did. The application of the assignment-of-income doctrine, however, is not conditioned on the assignor having received income. See *Kinsey v. Commissioner*, 477 F.2d 1058 (2d Cir. 1973), affg. 58 T.C. 259 (1972); *Hudspeth v. United States*, 471 F.2d 275 (8th Cir. 1972). Receipt of money has no bearing on the issue; petitioner simply had no fixed right to the unrealized appreciation on the currency contracts prior to the delivery dates of such contracts.

In support of his argument for the application of the assignment-of-income doctrine, respondent relies primarily on the principles established in *Jones v. United States*, 531 F.2d 1343 (6th Cir. 1976), and *Kinsey v. Commissioner, supra*. In *Jones* and *Kinsey*, the taxpayers each donated shares of corporate stock to a charity subsequent to the corporation's adoption of a plan of complete liquidation. The issue in both cases was whether such donation constituted an assignment of income that warranted treating the liquidation proceeds as income to the taxpayer. The Courts agreed with the Commissioner's contention and held that each transaction constituted an assignment of income.

Respondent notes that the Courts in *Jones* and *Kinsey* both held that "the realities and substance" of events must govern assignment-of-income principles. We agree, but believe that the application of the assignment-of-income principles to the instant case would result in ignoring both the realities and substance of events as to the sale of the currency contracts at issue. The "realities and substance" were that petitioner's right to the proceeds had not so matured or ripened that the sale of the contracts should become subject to the assignment-of-income doctrine. *S. C. Johnson & Son, Inc. v. Commissioner, supra* at 786.[12]

---

[12]Respondent's reliance upon *Commissioner v. Phillips*, 275 F.2d 33 (4th Cir. 1960), and *Paine v. Commissioner*, 23 T.C. 391 (1954), is misplaced.

In *Phillips*, the taxpayer sold an endowment policy 12 days before maturity. In *Paine*, the

· The taxpayers in *Jones* and *Kinsey* had virtually no control over the course of events once the corporation's plan of complete liquidation had been adopted. The liquidations were essentially irreversible and each taxpayer was, in effect, vested with a right to capital gain as a result of the liquidation. Petitioner, on the other hand, was not locked into receiving any particular form of capital gain. Petitioner held capital assets from which it could have realized gain by purchasing offsetting forward-currency contracts, purchasing British pounds sterling to deliver to the banks at maturity of the contracts, or selling the currency contracts, themselves. Petitioner chose the latter and reported the gain from the sales of the capital assets in the appropriate manner. Petitioner did not assign a fixed right to income but sold a contract to which income would probably accrue to the purchasers upon maturity, an event that had not yet occurred at the time of sale.

Admittedly, petitioner sold its contracts prior to maturity in order that the gain from the contracts would result in long-term rather than short-term capital gain. The fact that the contracts were transferred prior to maturity in order to minimize the income tax does not, in itself, warrant applying the assignment-of-income doctrine. *S. C. Johnson & Son, Inc. v. Commissioner, supra; Beard v. Commissioner, supra; Hobby v. Commissioner, supra.*

### III. *Conclusion*

A taxpayer is generally entitled to treat the gain realized from the transfer of an asset in 1968 as long-term capital gain if the asset in question was a capital asset within the meaning of section 1221 and, pursuant to section 1222(3), was transferred in a "sale or exchange" after being held for more than 6 months. Respondent has conceded that petitioner has satisfied the

---

taxpayers sold non-interest-bearing notes shortly before maturity, which notes had been issued originally on a discount basis for substantially less than face value. The assignments in those cases occurred before interest income had accrued in the accounting sense but after the taxpayer had acquired a right to receive payment thereof. The Courts, in both cases, held that the taxpayers did not avoid taxation on the interest already earned by selling the assets.

These cases are distinguishable in that the taxpayers in each case had an unquestionable fixed right to income already earned. The maturity or ripeness of the accrued economic gain, coupled with the fact that the gain was essentially equivalent to earned interest income, explains those decisions.

general sale and exchange and holding period rules regarding capital assets for long-term capital gain treatment.

Specifically, respondent agrees that the currency contracts constituted capital assets in petitioner's hands. Respondent further concedes that the transfers of the currency contracts were bona fide sales entitled to recognition for Federal income tax purposes. Indeed, respondent even agrees that no agency relationship existed between the parties and that all risk attributed to ownership of the currency contracts shifted from petitioner to the purchasers of the currency contracts. Finally, respondent has agreed that the currency contracts were held for a period of more than 6 months at the time of each transaction.

Nonetheless, respondent has attempted to avert the result of long-term capital gain treatment for the proceeds realized from the sales of the currency contracts by making two arguments that are founded on faulty reasoning and represent an unwarranted extension of Code sections and judicially created doctrines. Having found respondent's arguments unconvincing, we hold that petitioner properly reported the gain it realized from the sales of the currency contracts in its 1968 Federal income tax return as long-term capital gain.

To reflect the foregoing,

*Decision will be entered under Rule 155.*