**INTERNATIONAL FLAVORS & FRAGRANCES INC.,
Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 25, Docket 75–4030.

United States Court of Appeals,
Second Circuit.

Argued Sept. 23, 1975.

Decided Oct. 8, 1975.

George Rowe, Jr., New York City (Fulton, Walter & Duncombe, Michael J. Gaynor, New York City, on the brief), for petitioner-appellant.

Robert A. Bernstein, Atty., Tax Div., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews and Michael L. Paup, Attys., Washington, D. C., on the brief), for respondent-appellee.

Before FRIENDLY, HAYS and FEIN-BERG, Circuit Judges.

FEINBERG, Circuit Judge:

This appeal from a decision of the Tax Court, 62 T.C. 232 (1974), finding a deficiency of $73,715 in the 1967 tax payment of appellant International Flavors & Fragrances Inc. (IFF), comes to us in a peculiar posture. Appellee Commissioner of Internal Revenue persuaded a majority of the Tax Court on a theory from which he now withdraws. Instead appellee asks us to affirm on an alternative theory based on a finding of fact not made by the Tax Court majority. We decline the invitation and remand the case to the Tax Court so that the full court may rule on the point in the first instance.

IFF creates and manufactures flavor and fragrance products used by other manufacturers in a variety of consumer items. It owns or controls a number of foreign corporations, which do similar business overseas. This litigation arises out of a transaction in late December 1966, when IFF was allegedly concerned over the effect an expected devaluation of the British pound would have on its annual statement. (The accounts of a British subsidiary were included in a consolidated statement expressed in dollars.) At that time, IFF contracted to sell to First National City Bank 1.1 million pounds sterling at $2.7691 per pound, delivery and payment to be on January 3, 1968.[1] In November 1967, the wisdom of the move became apparent when the pound was devalued from $2.80 to $2.40.

Two weeks before the January 3, 1968 delivery date, IFF "sold" its contract with First National City Bank to Amsterdam Overseas Corp. for $387,000. On the same day, Amsterdam and IFF notified the Bank of their agreement, and Amsterdam agreed to assume liability thereunder.[2] Also on the same day, Amsterdam contracted to buy from the Bank, at the new $2.40 rate and for delivery on January 3, 1968, the pounds it needed to fulfill IFF's contract with the Bank. On the next day, December 21, 1967, Amsterdam sent a check to IFF for $387,000, the agreed-upon price for purchase of the contract. On January 3, 1968, Amsterdam closed out the contract with the 1.1 million pounds sterling purchased from the Bank on December 20, 1967. Amsterdam made a net gain on the transaction of $10,210.

At issue is the proper tax treatment of the $387,000 received by IFF from Amsterdam. In the Tax Court, IFF argued that this sum was gain from the sale of a capital asset held over six months and was properly treated by IFF as a long-term capital gain. I.R.C. § 1222(3). The Commissioner took alternative positions: First, the transaction with Amsterdam was not a bona fide sale of contract rights, but rather the purchase by IFF through Amsterdam of the pounds neces-

---

1. According to a contemporaneous IFF internal memorandum, the 1.1 million figure was chosen to protect the "exposed net current assets" of IFF's British subsidiary, calculated to be approximately $1,500,000. Since the after-tax protection afforded by such a contract was expected to be only 53%—apparently it was assumed that any gain on the contract would be treated as ordinary income—the value of the contract was $3,000,000, then equivalent to 1.1 million pounds.

2. Apparently, however, IFF never received a release from the Bank.

sary to fulfill its forward sale contract with the Bank, and the resulting gain was therefore to be treated as short-term capital gain under the provisions of I.R.C. § 1233 governing short sales. Second, IFF's contract with the Bank was not a capital asset, and the gain on the sale was ordinary income, under the rule of *Corn Products Co. v. Commissioner,* 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), which teaches that capital gain treatment is reserved for "transactions in property which are not the normal source of business income." Id. at 52, 76 S.Ct. at 24.

A majority of the Tax Court, in an opinion by Judge Quealey, accepted the second argument. As to the first, the majority said merely:

> In view of our decision with respect to the applicability of the *Corn Products* doctrine, it is not necessary to decide the alternative question whether the petitioner has met its burden of proving that the transaction between the petitioner, Amsterdam and FNCB was not in substance a purchase by the petitioner of pounds sterling to meet its obligations under the short sale, thereby making the gain taxable under the provisions of section 1233. In view of the sequence of events, however, it is clear that Amsterdam did not intend to assume any risk. In the absence of testimony from representatives of Amsterdam, suffice it to say that its role appears to be more nearly that of the broker than a purchaser. Cf. *Frank C. LaGrange,* 26 T.C. 191 (1956).

62 T.C. at 240.

**3.** The special provisions of § 1233(b) for calculating holding periods in short-sale situations only apply to "stocks and securities . . . .," and commodity futures." I.R.C. § 1233(e) (2)(A). It has been argued, however, that the statute should be construed to apply more broadly. See Costello, Tax Consequences of Speculation and Hedging in Foreign Currency Futures, 28 Tax Lawyer 221, 225–28 (1975), and authorities there cited. See also *Gillin v. United States,* 423 F.2d 309, 313 n.9 (Ct.Cl.1970), declining to decide the issue.

**4.** Entry into such offsetting contracts has been held to be equivalent to delivery under the sale

Judge Tannenwald, writing a concurring opinion for himself and two colleagues, followed a different course. He "eschew[ed] issues relating to the reaches of the 'integral part of the business' doctrine upon which *Corn Products* . . . is founded and to the applicability of section 1233, either directly or by analogy." Instead, he concluded that short-term capital gain treatment was proper "upon the factual basis that Amsterdam was in reality acting on behalf of" IFF. Id. In effect, the three concurring judges accepted the Commissioner's view of the facts, but rather than adopting his argument that those facts were governed by section 1233—a proposition which is open to question[3]—they simply concluded that there was no bona fide "sale" of property to Amsterdam within the meaning of section 1222(3). As a result, the gain from these transactions would be short-term capital gain, since IFF settled its forward sale agreement with the Bank on December 20, 1967 by entering an offsetting forward purchase agreement, through Amsterdam, with the Bank.[4] The concurring judges' inference that the transaction with Amsterdam was not bona fide was based on the facts that Amsterdam, at the time it purchased IFF's contract with the Bank, also purchased pounds sterling from the Bank to cover Amsterdam's liability to produce pounds, and that IFF failed to prove that it did not participate in, or know of, the latter transaction.

Finally, Judge Hall and two colleagues dissented, holding that *Corn Products* did not apply because "The contract here

contract, *Chicago Board of Trade v. Christie Grain & Stock Co.,* 198 U.S. 236, 248, 25 S.Ct. 637, 49 L.Ed. 1031 (1905); *Lyons Milling Co. v. Goffe & Carkener Inc.,* 46 F.2d 241, 247 (10th Cir. 1931); *Arnall v. United States,* 59–2 U.S. Tax Cas. ¶ 9779 (N.D.Ga.1959), and to satisfy the "sale or exchange" requirement of the then applicable Code provision, *George W. Covington,* 42 B.T.A. 601, 605–06 (1940), aff'd in part, 120 F.2d 768 (5th Cir. 1941), cert. denied, 315 U.S. 822, 62 S.Ct. 912, 86 L.Ed. 1219 (1942). See also *S.C. Johnson & Son, Inc.,* 63 T.C. 778, 787 (1975).

and the property (pounds) were clearly not the normal source" of IFF's "business income," 62 T.C. at 244, and that the "sale" of the IFF-Bank contract was bona fide. Id. at 244–45.

On appeal to this court, IFF argues that the three dissenting judges were correct on both counts. The Commissioner, however, no longer relies on either the *Corn Products* doctrine, the basis of the Tax Court majority opinion, or section 1233, adopting instead the analysis of Judge Tannenwald. The stated reason for the Commissioner's change of heart regarding the *Corn Products* doctrine is that it "has not heretofore been applied in a case in which a hedging operation was entered into by one corporation as a protection against a potential inventory loss of another corporation, even where the second corporation is a subsidiary of the first."[5] The Government's sudden diffidence on application of *Corn Products* may be well advised,[6] although the Tax Court may find it surprising after the Government's successful urging of the doctrine in that forum.

Putting *Corn Products* to the side, both parties concentrate on whether the transaction was a "sale" of property to Amsterdam within section 1222(3), rather than a contract for Amsterdam to purchase pounds on IFF's behalf. IFF asks us to decide this fundamentally factual issue in its favor as a matter of law. The Commissioner also asks us to resolve the issue—precisely the other way—and emphasizes the factual finding in Judge Tannenwald's concurring opinion, which the Commissioner says was "expressly approved by the majority." We believe that either course would be inappropriate.

It is true that the three concurring judges of the Tax Court did find that Amsterdam "in reality" acted on behalf of IFF when it executed the forward purchase contract with the Bank. But, contrary to the Commissioner's argument to us, the judges who constituted the majority made no such finding.[7] While the majority did raise an eyebrow at the transaction, they explicitly did not decide the issue whether IFF had "met its burden of proving that the transaction . . . was not in substance a purchase [by IFF] of pounds sterling to meet its obligations under the short sale." That issue can hardly be characterized as calling for resolution only one way. Six judges of the Tax Court have considered it and split evenly on their conclusions. The evidence in the record clearly justifies conflicting inferences; neither Judge Tannenwald's nor Judge Hall's resolution of the question could be considered "clearly erroneous" on the record as it now stands. The question therefore would seem to be for the trier of fact. Accordingly, we reverse the judgment of the Tax Court and remand for consideration of the issue that the majority judges declined to decide. The Tax Court is, of course, free to take further evidence and to deal with any other issues that may arise.

Reversed and remanded. Costs to abide the event.

---

5. Appellee's brief, at 13.

6. See Costello, supra note 4, at 244–48.

7. The case was tried before Judge Quealey alone, and the report of the case states that it was "Reviewed by the Court." See I.R.C. § 7460; When You Go to the Tax Court: Procedure and Practice (CCH 1972). Judges Tannenwald, Goffe and Wiles concurred in a separate opinion and Judges Hall, Forrester and Sterrett dissented, but it is not clear from the report how many judges joined in Judge Quealey's majority opinion. It has been said that "we rarely have a full complement of 16 Judges at Court Conference because at least four, five, or six of us are out on calendar at any one time." Tannenwald, How to Try an Estate or Gift Tax Case, Fourth Annual Institute on Estate Planning—University of Miami Law Center, 14–1 at ¶ 70.1416 (1970).