**NALCO CHEMICAL COMPANY AND SUBSIDIARIES, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 79 C 4365.

United States District Court, N.D. Illinois, E.D.

Feb. 18, 1983.

David S. Gibbons, Chadwell & Kayser, Ltd., Chicago, Ill., for plaintiffs.

D. Patrick Mullarkey, Dennis M. Donohue, Tax Div., Dept. of Justice, Washington, D.C., for defendant.

1. The record evidence before the court consists of 103 exhibits, six depositions, the parties' stipulation concerning foreign law, and their stipulation of record material.

2. "Stip." refers to the parties' "Stipulation of Record Material."

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This tax refund litigation concerns the deductibility of corporate payments to a nearly wholly-owned foreign subsidiary under the terms of an indemnification pledge. By agreement of the parties, trial has been held on stipulated facts and exhibits.[1] The memorandum which follows constitutes the court's findings of fact and conclusions of law.

## I. Facts

Taxpayer Nalco Chemical Company ("Nalco") is a Delaware corporation whose principal place of business is in Oak Brook, Illinois. Nalco manufactures and sells specialty chemicals and related products throughout the world. (Stip.[2] ¶ 2) Prior to 1967, Nalco owned the entire stock of a British subsidiary, Nalco Limited. (Palmer Dep.[3] at 7) Nalco Limited furnished specialty chemical services for customers in the petroleum, metal, paper, textile and mining industries. (Ex. 3, p. 5) The subsidiary acted as "a sales organization selling and servicing Nalco Chemical—or delivering Nalco Chemical type business in the U.K." (Palmer Dep. at 8)

In 1967, Nalco agreed to combine Nalco Limited with ICI Alfloc, a wholly-owned British subsidiary of Imperial Chemical Industries, Limited ("ICI"), a British chemical firm. (Ex. 3). ICI Alfloc had engaged principally in "the business of supplying a service for the resolution of [water treatment] problems." (Ex. 3, p. 5) Out of the resulting combination a new joint venture entity, Nalfloc Limited ("Nalfloc"), was created. Nalfloc succeeded to the assets, liabilities and businesses of both Nalco Limited and ICI Alfloc. It was contemplated

3. "Palmer Dep." refers to the Government's deposition of Lloyd J. Palmer. During the pertinent time periods, Mr. Palmer was a high ranking executive of taxpayer. (Palmer Dep. at 4)

that Nalfloc would counsel clients experiencing particular types of chemical problems, and would procure the chemicals and equipment needed to effectuate its advice. (Ex. 3, p. 7)

Under the terms of the joint venture agreement, Nalco obtained a 49% equity interest in Nalfloc, and ICI acquired the remaining 51%. As a further condition of the agreement, Nalco agreed to lend Nalfloc 1,300,000 British pounds at a 7% annual rate. (Ex. 4)

At this time, the British Exchange Control Act of 1947 barred foreign corporations from engaging in certain transactions without the prior approval of the British Government. (For. Stip.[4] ¶ 2) Nalco sought permission from the Bank of England[5] to borrow "by way of a sterling loan raised in the U.K." the 1,300,000 pounds it needed to loan to Nalfloc. (Ex. 1) Permission was denied as the Bank ruled that the loan monies had to be raised from "external" (i.e., non-British) sources. (Ex. 2) Nalco consequently fulfilled its joint venture obligation by loaning Nalfloc pounds which Nalco purchased in the United States with American dollars. (Palmer Dep. at 11)

Because it was a creditor of a loan payable in a foreign currency (i.e., pounds), Nalco was exposed to the risk of a currency exchange loss in the event the pound lost value relative to the dollar during the pendency of the loan.[6] To protect itself, Nalco purchased contracts committing it to a future delivery of pounds. (Palmer Dep. at 35; Ex. 2 to Jackson Dep.[7])

Eight months later, on January 3, 1968, President Lyndon B. Johnson issued Executive Order 11387. This Order restricted the permissible amount of capital that could be exported from the United States. Most significantly, under the Foreign Direct Investment Controls ("FDIC") regulations, a foreign subsidiary's annual earnings were deemed a capital outflow chargeable to the subsidiary's domestic parent. This interpretation created a need for Nalco to "repatriate" its outstanding loan to Nalfloc. Nalfloc's repayment would be a capital inflow offsetting the outflows attributed to the earnings of Nalco's existing foreign subsidiaries. (Palmer Dep. at 18–20; Ex. 11)[8] To achieve this result, Nalco's officers decided to establish a foreign financing subsidiary. Their plan was to have the new subsidiary borrow funds offshore and lend them to Nalfloc. Nalfloc would then use the latter proceeds to repay Nalco.[9]

For various reasons, Nalco selected Switzerland as the situs for its new subsidiary, and on December 19, 1968, Nalco Capital Corporation A.G. ("Capital") was formed. (Palmer Dep. at 19–20) Thirty thousand shares of Capital's stock were issued, with Nalco owning all but five.[10] The subscribed capital was three million Swiss francs; one million Swiss francs were paid in. The board of directors (called in Switzerland the "board of administrators") consisted of five individuals, three of whom were prominent Swiss businessmen having no formal connection with Nalco. (Ex. 23) Swiss law required that a majority of Capital's di-

4. "For. Stip." refers to the parties' "Stipulation Concerning Foreign Law."

5. The Bank of England administered the Exchange Control Act on behalf of the Treasury Department of the British Government. (For. Stip. ¶ 3)

6. If this contingency occurred, Nalfloc would repay its loan with pounds having less purchasing power in the United States, the domicile of the creditor.

7. "Jackson Dep." refers to the Government's deposition of Graham Jackson, Jr., a financial officer of Nalco.

8. At this time, Nalco owned interests in several subsidiaries other than Nalfloc. (Palmer Dep. at 5)

9. The Loan to Nalfloc could not be refinanced through a non-subsidiary lender without ICI's permission. (Ex. 3, p. 33) ICI was not amendable to such an arrangement. (Palmer Dep. at 60, 62)

10. Each of Capital's five board members also received one share each. (Ex. 23, p. 2)

rectors be Swiss nationals. (Mueller Dep.[11] at 9–10).[12]

Prior to the actual incorporation of Capital, Nalco negotiated the terms of a loan under which Dow Banking Corporation of Zurich ("Dow") agreed to loan Nalco's prospective Swiss subsidiary 14,000,000 Swiss francs. The interest rate was 6¼% per annum. (Ex. 24) Dow demanded and received from Nalco an unconditional guarantee for the repayment of this loan. (Ex. 25)

As discussed before, the plan was to have Capital use the proceeds of its Dow loan to make a second loan, at 7% and in British pounds, to Nalfloc. For reasons to be detailed later, Capital's three Swiss directors demanded that Nalco indemnify Capital for any losses it might incur on its loan to Nalfloc. (Ex. 19) The Swiss directors made it quite clear that they would not assume their positions without the requested indemnification. (Bruderer Dep. at 15; Bruppacher Dep. at 16–17 [13]) Their demand was received at Nalco headquarters on December 17, 1968, and on that same day, Nalco responded with a telegram agreeing to the proposed terms. A follow-up letter (also dated December 17, 1968) memorialized the arrangement:

> Nalco Chemical Company has agreed to indemnify Dow Banking Corporation for any losses incurred in connection with loans it has agreed to make to Nalco Capital Corporation A.G. Nalco Chemical Company hereby agrees that it will not seek reimbursement from Nalco Capital Corporation A.G. for any amounts which Nalco Chemical Company may be required to pay to Dow Banking Corporation in connection with the guaranty which has been given.

'Nalco Chemical Company further agrees to indemnify and hold harmless Nalco Capital Corporation A.G. from any loss which may be incurred in connection with its loan agreement with Nalfloc Limited, a United Kingdom company, as a result of devaluation of the pound sterling, the currency in which the loan from Nalco Capital Corporation A.G. to Nalfloc Limited is denominated.

(Ex. 21) Two days later, on December 19, 1968, the transactions were closed: Capital was incorporated, and the loans from Dow to Capital and from Capital to Nalfloc were executed.[14]

The latter loan matured 15 months later and was then renewed, but for a different term (one year) and at a different interest rate (9%). (Ex. 35) At the same time, Capital took out a new 11,000,000 Swiss franc loan from Dow payable in one year. The interest rate charged by Dow was 9⅛%. (Ex. 31) In connection with this loan, Nalco executed a second guarantee in Dow's favor. (Ex. 34) Also, a second letter of indemnification, identical in all material respects to the initial one, was given to Capital to cover its exposure on its renewed loan to Nalfloc. (Ex. 37)

Both loans were renewed for one year on two additional occasions. (Exs. 45, 50, 60, 65) Capital charged Nalfloc 7⅜% interest each time. (Exs. 50, 65) Moreover, Nalco renewed its guarantee and its indemnification pledge at each instance. (Exs. 46, 49, 61, 62)

Within a month after the fourth and final set of loans was made, the British Government abandoned the exchange control regulations that had prevented Nalco from loaning Nalfloc domestic pounds. (For. Stip. ¶ 12) In February 1973, approximately one

---

**11.** "Mueller Dep." refers to the Government's deposition of Johannes Mueller, a Swiss attorney. Mr. Mueller prepared the documents incorporating Capital.

**12.** Capital's remaining two board members were officers of Nalco, Mr. Lloyd J. Palmer, *see* note 3, *supra,* and Dr. David G. Braithwaite, the president of Nalco. (Ex. 23)

**13.** "Bruderer Dep." and "Bruppacher Dep." refer, respectively, to the Government's depositions of Hans Peter Bruderer and Willy Bruppacher, two of the three Swiss directors of Capital. The third director, Ernst G. Renk, died prior to the commencement of this litigation.

**14.** The funds Capital received from Dow were actually transmitted directly to Nalco. In this way, Nalfloc repaid the 1,300,000 pounds it owed Nalco.

month before the final loans were due, the FDIC regulations were also discontinued. (Palmer Dep. at 88) As a result, it was no longer necessary for Nalco to use a foreign financing subsidiary to further its aims, (Exs. 71–73), and on March 19, 1973, Nalco made a direct loan to Nalfloc of 1,300,000 pounds, at 8% interest, payable in one year. (Ex. 75) Nalfloc transferred this sum to Capital to repay its then outstanding debt. (Palmer Dep. at 88)

Between December 1968 (when the initial Capital loan to Nalfloc was made) and March 1973 (when Nalfloc repaid Capital), the British pound lost value relative to the Swiss franc. In the process, Capital suffered a substantial exchange loss—3,008,200 Swiss francs—on its loan to Nalfloc. (The exact dollar amount of this figure is disputed, but it appears to be somewhere in the vicinity of one million dollars.) Capital lacked sufficient funds to repay Dow.

It is undisputed that Nalco was at this point legally obligated under its indemnification agreements to hold Capital harmless from the exchange loss it had incurred. It is further agreed that Nalco was obligated to pay Dow whatever amount Capital could not. In order to satisfy these obligations, Nalco immediately transferred 1,200,000 Swiss francs to Capital (Ex. 74). This payment allowed Capital to repay Dow in full.

The remaining 1,800,000 Swiss francs owing under the indemnification agreements were accrued on Nalco's books as an account payable. Final payment of this amount occurred in May 1974.[15]

In computing its 1973 income tax return, Nalco deducted the dollar equivalent of the payments it had made to Capital under the indemnification agreements. The Internal Revenue Service disallowed the deduction and this suit followed.[16]

## II. Section 162(a)

, Nalco first argues that its indemnification payments are "ordinary and necessary" business expenses deductible under section 162(a) of the Internal Revenue Code of 1954.[17] The Government concedes that the "necessary" prong of this test is satisfied, but otherwise disputes the taxpayer's position.

Resolution of this controversy turns primarily on whether the subject payments served to benefit *Nalco's* business in a "direct" or "proximate" manner.[18] The Government contends that by entering into its indemnification pledges, Nalco merely enhanced the value of its ownership interest in Nalfloc, thereby rendering the resulting payments nondeductible contributions to the capital of the latter entity.[19] This argument derives from the observation that whenever a loan is extended in a nondomestic currency, one or both of the parties to the transaction must bear the risk of loss caused by the possibility of a change in the applicable currency exchange rate. To protect itself, a rational creditor will thus do one of two things: shift the risk to the borrower (i.e., demand repayment in the creditor's domestic currency), or charge an interest rate which is higher than that demanded in domestic currency transactions, in order to compensate for the added risk.

---

**15.** At that time, Nalco also paid Capital 246,206 Swiss francs in interest on the debt. The tax treatment of this payment is not in dispute.

**16.** The Government concedes that if these payments are deductible, the deduction was proper in 1973 (even though one payment was not made until 1974).

**17.** Section 162(a) provides in pertinent part: There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.

**18.** Despite the taxpayer's protestations to the contrary, it is clear that a claim under § 162(a)

can be upheld only if the payments at issue "proximately result . . . from the *taxpayer's* business." *Deputy v. DuPont*, 308 U.S. 488, 494, 60 S.Ct. 363, 366, 84 L.Ed. 416 (1940) (emphasis added). Payments that serve *only* the interests of a second entity—even one wholly owned by the taxpayer—do not come within the statute's reach. *Interstate Transit Lines v. C.I.R.*, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943).

**19.** The Government does not view these payments as contributions to the capital of Capital. (Answer to Plaintiffs' Interrogatory # 8.)

The Capital-Nalfloc loans, so the Government argues, deviated from this norm. The creditor (Capital) was to be repaid in a foreign currency (pounds) at rates insufficient to reflect the true risk at stake. Thus, only because Nalco had placed [20] Capital in such a disadvantageous position was the "independent" Swiss demand for indemnification ever made. Furthermore, by agreeing to this demand, Nalco essentially paid the premium that Nalfloc itself would have incurred had it attempted to procure a pound loan from a nonaffiliated Swiss source. The agreement to indemnify must thus be viewed, according to the Government, as an attempt by Nalco to relieve Nalfloc of an expense and thus as a contribution to the subsidiary's capital.

The Government alternatively points out that Nalco agreed in its initial discussions with ICI to bear the risk of currency loss on Nalco's initial loan to Nalfloc. ICI "was not agreeable to Nalfloc having a foreign currency exposure in the form of foreign currency other than pounds sterling running from Nalfloc to Nalco or any affiliate company." (Palmer Dep. at 26) When the loan was transferred to Capital, this principle remained intact; the loan continued to be denominated in pounds sterling, and the risk of loss fell once again—via the indemnification agreement—upon Nalco. Thus, "[s]ince the payments under the indemnification have, as their origin, taxpayer's agreement with ICI to bear the currency exposure, these payments . . . represent nothing more than part of the purchase price paid by it for its stock of that joint venture." (Reply Brief for the Defendant at 12).

In rebuttal, Nalco asserts that the interest rates charged by Capital were proper, and that, in any event, Nalco received numerous proximate benefits from the transactions at issue. The latter claim is basically threefold: (1) Had Nalco defaulted on its concededly binding obligation to Capital, its credit rating would have plummeted in the important financial center of Zurich. Un-der these circumstances, future Swiss financing for both Nalco and its subsidiaries might have proved difficult to obtain. (Bruderer Dep. at 32). Furthermore, in the event of a default by Nalco, Capital could not have repaid Dow. Nalco's substantial business relationship in the United States with Dow Chemical Company, Dow's corporate parent, might thereby have been injured. (2) Had Nalco refused to meet the initial Swiss demands for indemnification, the three Swiss directors would have refused to participate in the Capital venture from the outset. The withdrawal of such prominent men would have, as before, irreparably damaged Nalco's reputation in Zurich. (3) "Nalco formed its financing subsidiary and agreed to the indemnification liability in order to allow Nalco's then established international business operation to earn profits and still comply with the FDIC." (Brief of Fact and Law of Plaintiff at 25).

The court has considered each of Nalco's arguments, and finds that none is persuasive. They will be addressed seriatim.

### A.

■ Nalco's first line of argument plainly fails. A taxpayer could always assert that its business reputation depended upon its timely satisfaction of its outstanding obligations. Yet, if this reasoning were sufficient in itself to render the actual payment of all such obligations "ordinary," anomalous results might follow. A taxpayer that entered into an executory contract to purchase stock held by a bank could later argue that its satisfaction of the contract was deductible, even though the payment was made to obtain corporate shares, the quintessential capital assets. Nalco's argument clearly proves too much.

■ Nalco has simply adopted the wrong perspective for analyzing its payments. It has focused on the consequences that might result from nonpayment, rather than the reasons why its obligations were incurred in

---

**20.** The record indicates that Nalco dictated the interest rate demanded by Capital. (Jackson Dep. at 10; *see also* Ex. 85; Bruppacher Dep. at 17.)

the first place. Yet it is clear that the second inquiry is controlling:

> The fact that an obligation to pay has arisen is not sufficient. It is the kind of transaction out of which the obligation arose and its normalcy in the particular business which are crucial and controlling.

*Deputy v. DuPont,* 308 U.S. 488, 496, 60 S.Ct. 363, 367, 84 L.Ed. 416 (1940); *accord, Interstate Transit Lines v. C.I.R.,* 319 U.S. 590, 594, 63 S.Ct. 1279, 1282, 87 L.Ed. 1607 (1943); *see also United States v. Hilton Hotels Corporation,* 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970); *Woodward v. C.I.R.,* 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970); *Anchor Coupling Company v. United States,* 427 F.2d 429 (7th Cir.1970), *cert. denied,* 401 U.S. 908, 91 S.Ct. 866, 28 L.Ed.2d 806 (1971). To prevail, Nalco must prove that it *initially entered into* the indemnification agreements as part of an ordinary rather than a capital transaction.

### B.

█ Nalco's second argument cures the defect isolated in subpart A., *supra.* Nevertheless, the deduction cannot be sustained on the theory that Nalco prevented serious injury to its reputation by agreeing to the Swiss demands.

Nalco places primary reliance on three decisions: *Scruggs-Vandervoort-Barney, Inc.,* 7 T.C. 779 (1946), acq. 1946–2 C.B. 5; *L. Heller & Son, Inc.,* 12 T.C. 1109 (1949), acq. 1949–2 C.B. 2; *Metro Land Co., Inc.,* 42 TCM (CCH) ¶ 335 (1981). In each of these cases the taxpayer was a corporation that agreed to assume liabilities incurred by an affiliated corporation. In each case it was held that the assumption of the third party's debts was deductible since the taxpayer had thereby protected its own reputation and good will. The facts of these cases differ substantially, however, from those found here.

In *Scruggs-Vandervoort-Barney, Inc., supra,* the taxpayer was a retailing corporation that acquired, through reorganization, the assets of a predecessor-retailer. One

asset obtained by the taxpayer was a 97.25% ownership interest in a bank which had operated on the premises of the predecessor's store. Four years earlier, the bank had become insolvent, dashing the expectations of numerous creditors, many of whom were potential customers of the taxpayer. Since the bank, the predecessor, and the taxpayer all had similar names, the taxpayer feared that it would be held accountable in the public eye for the bank's failure. It accordingly decided—though it was under no legal obligation to so act—to reimburse in part the losses suffered by the bank's creditors. Local bankers consulted by the taxpayer agreed that such a move was necessary to forestall a loss of sales. On these facts, the Tax Court allowed the taxpayer to deduct the amounts it had incurred in reimbursing the depositors; the expenditures were made to "retain or protect [the taxpayer's] preexisting good will." *Id.,* 7 T.C. at 788.

The taxpayer in *L. Heller & Son, Inc., supra,* engaged, along with a wholly-owned subsidiary, in the jewelry business. When the latter entity went bankrupt, its creditors received 45 cents on each dollar of outstanding debt. In response, the Jeweler's Board of Trade withdrew the *taxpayer's* first-class credit rating. Upon inquiry, one officer of the Board suggested that it would be in the taxpayer's best interest to pay off the remaining claims held by the creditors of the subsidiary. The taxpayer did, and its first-class rating was restored. As before, the Tax Court ruled that it was permissible for the taxpayer to deduct the amounts it had spent to discharge its subsidiary's debts. That these debts were not legally binding on the taxpayer did not end the matter. It was clear to the Court that the payments were "calculated to protect and promote petitioner's business." *Id.,* 12 T.C. at 1112.

A different, but related, situation arose in *Metro Land Co., Inc., supra.* There, the taxpayer was a real estate development corporation owned by shareholders who also owned several construction firms. In 1968 the taxpayer developed a critical need for

funds. However, because of its shareholders' poor credit rating, the taxpayer was unable to locate a willing lender. Finally, one lender agreed to loan funds, but only after the taxpayer agreed to pay off the outstanding debt owed to that party by the construction companies related to the taxpayer. These companies had by this time gone bankrupt. In the Tax Court's view, the payments made by the taxpayer under this agreement were most properly characterized as nondeductible constructive dividends. Yet in light of the Government's failure to argue this theory, the Court declined to rule on such a basis. *Id.,* 42 TCM (CCH) at p. 265–66. It instead held for the taxpayer, finding that the latter's payments were "made to retain or protect and promote an established business." *Id.* at 267.

In each of these cases, therefore, the taxpayer brought forth compelling evidence proving that it had directly and proximately protected its own preexisting business by assuming the debts of another. Indeed, in *Scruggs-Vandervoort-Barney, Inc.* and in *L. Heller & Son, Inc.,* third parties—the bankers in the former case and the Board official in the latter—agreed with the taxpayer's position prior to litigation. The evidence adduced by Nalco in support of its position is, by contrast, quite weak. The proof consists entirely of the following passages drawn from Mr. Palmer's deposition:

MR. DONOHE [Government Counsel]: What specifically were the reasons why Nalco Chemical agreed to enter into these indemnification agreements or indemnification agreement?

MR. PALMER: Totally overall, it was my judgment at the time that our cost on an unhedged basis of doing this whole deal, that is, borrowing Swiss francs and lending pounds overall would not affect us adversely. We would be as well off doing it that way as to borrow sterling and lend sterling, so we were not particularly reluctant to agree to it from a purely financial standpoint.

There were some other considerations as well and many other reasons as important, at least to some of our people, these three individuals who are Swiss directors are very prominent in the business community. Two of them were in the financial end of their business: Mr. Renk, with the Union Bank of Switzerland and Mr. Bruppacher with Swiss Reinsurance Company.

In these jobs, among other things, they were concerned with in Switzerland, investment of Swiss bank funds. All over the world, they became acquainted with the name Nalco through the fact they held some Nalco shares in their portfolios and had for a number of years, and thought very highly of the company.

Our conclusion was that not to accede to their requests for indemnification and proceed without that could be such a damaging blow to our reputation and the way they looked at Nalco management and the way they looked at the company, it would be imprudent for us to ignore that request.

\*      \*      \*      \*      \*      \*

MR. DONOHUE: Specifically could you relate what would have been the potential or possible damage to Nalco Chemical's reputation that you are referring to?

MR. PALMER: *I can try to answer that and I am just guessing now. Of course, we don't really know,* but the Swiss business community is a very close and tight community. Everybody knows everybody else and despite the fact that rules of secrecy are well known and observed, a lot of conversation goes on about what is happening. And something of the type we were doing, certainly, particularly if the gentlemen felt compelled to withdraw as directors of Nalco Corporation would trigger a lot of repercussion and a lot of people asking questions of what was going on.

And if people with the reputations they had were to sever their relationship, we just didn't want to cross that bridge or even come close to it.

(Palmer Dep. at 110–12) (emphasis added). Such vague and qualified statements pale in comparison to the evidence adduced in the prior decisions. Indeed, Mr. Palmer's cited

fears must be discounted to at least some extent given his further remark that during the relevant period of time Nalco was a "liquid company . . . not particularly desirous" of venturing into the capital markets. (*Id.* at 89) Judgment cannot be entered in Nalco's favor on its proffered theory.

The cases relied upon by Nalco are distinguishable on a separate ground as well. In each, the taxpayer assumed the debt of a defunct corporation, an entity not likely to be the recipient of a new infusion of capital. *Allen v. C.I.R.*, 283 F.2d 785, 790 (7th Cir. 1960) ("The condition of the corporation and its business belie any intention of making an investment in the corporation or its business.") Here, however, no such consideration militates against the theory, developed *infra*, that Nalco's indemnification payments were in reality contributions to the capital of either Nalfloc or Nalco's other profitable subsidiaries. As far as the record reveals, during the entire period covered by this litigation, these corporations were healthy business entities.

Finally, and perhaps most significantly, Nalco's analysis artificially cuts short the inquiry into causation. In this phase of its argument, the taxpayer proposes to examine its behavior solely at the point of the Swiss demand. It completely ignores the transactional background out of which the demand grew. The analysis in subpart C., *infra*, supplies the missing discussion. The conclusion reached there is that this "background" is clearly capital in nature. The presence of a demand reasonably flowing therefrom cannot alter the result.

### C.

█ Nalco lastly contends that its refinancing transactions were designed merely to permit the profitable continuation of its "established international business operations" under more stringent regulatory conditions. This argument accurately characterizes the record, but does not lead to the conclusion Nalco seeks. By entering into the transactions under scrutiny, Nalco brought about a repatriation of funds. It thereby generated a net capital inflow,[21] improved its capital export position, and obviated the need to alter its "international operations" in an alternative, less satisfying manner.[22]

This logic does not justify Nalco's claim for a deduction, however, because it fails to account for the source and nature of the problem Nalco encountered under the FDIC regulations. The record before this court makes clear that this problem grew out of Nalco's investment activities, not its manufacturing or sales business. Taxpayer's proposed finding # 17 acknowledges that the refinancing of Nalfloc was designed "[i]n response" to the Government's decision to treat "[t]he earnings of foreign *subsidiaries* of United States companies . . . as capital outflows." (emphasis added). Mr. Palmer testified in like fashion:

> The regulations counted as capital outflows which were limited under the regulations, items such as equity investments in new or existing operations outside the U.S.; loans outside the U.S. and I gues[s] most important for us, the earnings of the foreign affiliates were considered capital outflows
>
>   \*    \*    \*    \*    \*    \*
>
> We were in a situation where just the sheer growth of our foreign subsidiaries in terms of earnings was going to generate something under the rules considered capital outflow and we were going to have to offset that in some way, shape or form with inflows and the question was, how to do this.

21. Strictly speaking, only the initial set of refinancing loans gave rise to a capital inflow. At the time the renewal loans were made, the original loan from Nalco had already been repatriated; no new funds entered the United States as a result of the renewals. The renewals nevertheless served an analogous function. They permitted Nalco to continue its "international operations" by eliminating the need for a new capital outflow (i.e., on a second direct loan to Nalfloc).

22. For example, had the Nalfloc loan not been repatriated, Nalco might have been forced to sell some of its overseas investments or to withdraw capital in the form of dividends. (*See generally* Palmer Dep. at 18–19; Ex. 11)

(Palmer Dep. at 18–19) The regulatory problems that arose confronted Nalco as a successful shareholder, not as a chemical merchant. Taxpayer's need to counteract the FDIC rules originated from its ownership of nondepreciable capital assets, the stock it held in its profitable overseas subsidiaries.[23]

Viewed from a slightly different perspective, taxpayer's argument simply overlooks the fact that the "international business operations" it wished to continue were not its own, but rather those of its subsidiaries. The expenditures at issue were Nalco's costs of maintaining its investments in a desired form.

The decision in *Hoover v. Commissioner,* 72 T.C. 206 (1979), supports this analysis. In *Hoover,* the taxpayer owned numerous foreign operating subsidiaries whose assets and liabilities were included on the taxpayer's consolidated financial statement. In 1967 the devaluation of various foreign currencies, primarily the British pound, caused the taxpayer "[i]n accordance with generally accepted accounting principles . . . [to treat] the exchange loss as an extraordinary charge against its consolidated earnings. Thus, petitioner's earnings per share of common stock, which prior to the extraordinary charge was $2.09, was $1.54 after such charge was subtracted from petitioner's consolidated earnings." *Id.* at 215–16. In order to protect its "economic image," the taxpayer entered the foreign currency exchange market. First, it calculated the net value of each subsidiary's assets subject to risk, i.e., those appraised on the basis of the subsidiary's home currency. The above figure was then multiplied by the taxpayer's proportionate ownership interest in the subsidiary. Next, the taxpayer purchased a

contract committing itself to a future delivery of the foreign currency. The amount of the contract equalled the value of the taxpayer's proportionate share of the subsidiary's assets at risk. Shortly before the forward contract came due, the taxpayer purchased sufficient foreign funds to cover its obligation.

If the applicable foreign currency lost value relative to the dollar, the taxpayer would thus recognize a gain on its purchase and sale offsetting the loss (for financial reporting purposes) caused by the reduced value of the subsidiary holdings. Conversely, if the foreign currency gained versus the dollar, a taxable loss and a financial statement gain would result. The issue before the Tax Court was whether the taxable gains and losses were ordinary or capital. The Court held them to be capital.

Parallels can be drawn to the present case. Solely because of their foreign stockholdings, Hoover and Nalco both encountered serious difficulties—the former, with its "financial image"; the latter, with its capital export ledger. To alleviate these problems, both taxpayers took steps resulting in an expenditure of funds.[24] Ordinary treatment was inappropriate in *Hoover* because, *inter alia,* "[t]hese transactions . . . are geared to the protection of a stock investment, not the business operation. . . . Ordinary business operations are not at issue here." *Id.* at 237–38; *see also International Flavors & Fragrances, Inc. v. Commissioner,* 62 T.C. 232, 244 (1974) (Hall, J., dissenting)[25]; Costello, *Tax Consequences of Speculation and Hedging in Foreign Currency Futures,* 28 Tax Lawyer 221, 247 (1975). Hoover could not take an ordinary deduction for amounts it had spent to

---

**23.** There is absolutely no evidence to suggest that Nalco's FDIC problems were caused by any of its own business activities.

**24.** There is one significant difference between the cases. Because Hoover's expenditure occurred in connection with a sale or exchange of property, it was undisputed that Hoover was entitled to *some* deduction of an immediate nature. The controversy centered only on the extent of the offset. Here, no sale or exchange

is involved. Nalco is entitled to a full immediate deduction or only a reduced capital gain at the time it disposes of the affected shares. *See generally* note 33, *infra.*

**25.** The majority's holding in *International Flavors* was reversed by the Second Circuit, 524 F.2d 357 (1975). Its reasoning was disavowed in *Hoover* (72 T.C. at 237).

"hold" its problem-causing stock. Nalco has no greater claim.[26]

The analysis proposed by the Government suggests a refinement to this approach. The Government's principal claim, unlike the preceding discussion, stresses not the reasons underlying Nalco's perceived need to refinance Nalfloc, but rather the mechanics used to effect this result—the interest rates charged by Capital. The court quite readily agrees that these rates are significant and cannot be ignored. The court parts company only with the Government's implicit suggestion that these details are *all* that matter. The latter approach rests on a belief that the Swiss demanded indemnification solely because Capital received interest payments that were insufficient to compensate it for the exchange rate risks it bore. (Opening Brief for the Defendant at 20) It follows, if this premise is accepted, that Nalco's more basic need to restructure its overseas ventures did not by itself dictate either the Swiss demands or the resulting expenditures. Nalco's indemnification costs can be traced only to the use of the assertedly sub-market rates.

The Government's underlying assumption, however, is not warranted. The record reveals that the Swiss would have demanded indemnification regardless of the interest rates Nalfloc paid. Simply put, the directors' concerns extended beyond the exchange rate realm. One director questioned the general wisdom of lending to Nalfloc under any circumstances:

There was first of all the credit aspect. I knew nothing about a borrower called Nalfloc. I [didn't] know to what percentage Nalco was interested in Nalfloc. So I

had an English debtor as an unknown quantity. As I was not yet a director, I could hardly make any credit inquiries. I had some apprehension: Could a company pay back to us in Zurich ..., and we in turn pay back to Dow? So there I strongly felt that a parent company guarantee had to be available in one form or another.

(Bruppacher Dep. at 9; *accord, id.* at 15) Questions were also raised as to whether Capital would be adequately capitalized, given the size of its projected dealings, without Nalco's agreement to hold the subsidiary harmless from loss. (Bruderer Dep. at 11; Bruppacher Dep. at 8–10)[27] Finally, the evidence is overwhelming that the Swiss were a cautious breed who desired protection at all cost. Under Swiss law:

The director has a responsibility to the company, to the shareholders, to the creditors, to conduct the affairs of the company in a correct fashion. A liability ensues if a director, thru his negligence, has either damaged creditors or the corporate company or the shareholders. It's any liability. It is not only gross liability; it's any liability.

(Mueller Dep. at 15[28]) In the years following 1965, there was "a marked increase" in the number of suits filed to enforce the above liability. (*Id.*) Some of these controversies apparently developed when American corporations abandoned their Swiss subsidiaries after "thing[s] didn't go as ... planned." (Bruderer Dep. at 6, 21) To forestall such a chain of events—and the loss of money and reputation that would accompany it[29]—the Swiss demanded the

---

**26.** The *Hoover* Court rejected as unproven the taxpayer's claim that its expenditures had protected the market value of its shares, 72 T.C. at 239–41. Given this finding, the Court's assertion that Hoover's actions were "geared to the protection of a stock investment," *id.* at 237, most probably refers to the fact that the subject transactions eliminated Hoover's need to dispose of, or otherwise alter, its investments. The argument against Nalco is identical. *See* pp. 1283–1284 & n. 22, *supra.*

**27.** Attorney Mueller testified that, in his opinion, the capitalization of Capital was sufficient

under Swiss law without regard to the presence of the indemnification agreement. (Mueller Dep. at 8, 48) The Swiss directors were not so certain.

**28.** Attorney Mueller is clearly competent to render this summary of Swiss law. (*See* Mueller Dep. at 1–3)

**29.** Had Capital run into difficulties, both Bruderer and Bruppacher could have been held personally liable for any shortfall. Moreover, neither man could have looked to his main Swiss employer (respectively, Electro-Watt

indemnification guarantee. Their testimony was unanimous that they would not have served without the guarantee, and that their demand stemmed in large part from a desire to guard against the general dangers inherent in being a Swiss director. (Bruderer Dep. at 6, 9, 15, 20, 27; Bruppacher Dep. at 10, 11, 16–17; Mueller Dep. at 13–17; Palmer Dep. at 32–33, 112, 115) Once Nalco resolved to refinance its loan to Nalfloc through a Swiss subsidiary, it was predictable—without regard to the interest rates used—that a demand for indemnification would follow.[30]

The interest rates chosen nevertheless have clear significance. The use of below market rates, if indeed they were used, was not mandated by Nalco's need to respond in some fashion to the FDIC regulations. A refinancing plan under which Nalfloc paid Capital the market rates for similar Swiss franc loans would have sufficed. The presence of sub-market rates would thus indicate that Nalco attempted to do more through its refinancing plan than merely

comply with the FDIC requirements. As the Government suggests, the most likely explanations are twofold: Nalco either was obligated to act in this manner under its joint venture agreement with ICI[31] or simply wished to relieve Nalfloc of an expense the subsidiary would otherwise have paid.

Synthesizing the foregoing, the conclusion emerges that the amounts Nalco expended under its indemnification agreements are properly viewed as costs of FDIC compliance to the extent those sums would have been paid even if Capital had charged Nalfloc a competitive rate of interest. By contrast, any premium that Nalco might have paid due to the use of below market rates should be charged solely to Nalco's more particular interest in Nalfloc.[32] In either event, the subject expenditures grew out of Nalco's capital holdings, not its operational business.[33]

■ As a fallback line of argument, Nalco cites numerous decisions (in addition to

---

Limited and the Swiss Reinsurance Company) for reimbursement since individuals served in a personal, rather than corporate, capacity. (Bruderer Dep. at 29; Bruppacher Dep. at 5–6) Both the individual directors *and* their employers, however, would have lost face in the eyes of the Swiss financial community under such circumstances. (Bruderer Dep. at 27; Bruppacher Dep. at 11)

**30.** The breadth of the Swiss concerns is evidenced by the telegram Nalco received on December 17, 1968 setting forth the directors' demands. The Swiss requested both that Nalco hold Capital harmless from losses caused by a "devaluation of the pound," *and* that Nalco forswear suing Capital for reimbursement of funds paid to Dow under the terms of the loan guarantees executed in Dow's favor. (Ex. 19) The latter request—agreed to by Nalco (*See, e.g.*, Ex. 21)—was necessary, in part, to protect Capital from the nonexchange rate risks discussed in the text.

**31.** For example, if the 7% interest rate charged on the initial loan from Capital was in fact below market (*See* Ex. 85), the reason it was chosen would appear to be that there was simply no reason for Nalfloc to pay more. Prior to the formation of Capital, Nalfloc was already entitled, *under the terms of the original joint venture agreement,* to the use of 1,300,000 pounds at a cost of 7% per annum. Had Nalfloc—a corporation in which Nalco lacked a controlling interest—agreed to pay more, it

would have surrendered rights already possessed. The use of the 7% figure by Capital would thus appear to be rooted in Nalco's original understanding with ICI. (See Ex. 12) ("Since Nalfloc has been asked by Nalco to refinance its debt, Nalco has indicated its willingness to assist Nalfloc in borrowing from Nalco Capital Corporation on the same terms that Nalfloc is borrowing from Nalco.")

The same logic does not apply to the subsequent loan renewals. At the moment each of these documents became effective, Nalfloc's rights under its previous agreements had expired.

**32.** The Government contends that the market rate for a loan denominated in a foreign currency includes the cost of a forward contract balancing the creditor's foreign exchange posture. If so, the apportionment suggested by the court is more academic than real. Under this hypothesis, an exchange loss occurs only when a sub-market rate is used.

**33.** The significance of the interest rates charged by Capital thus lies in how one allocates Nalco's payments among the bases of its various subsidiary holdings. *But cf.* note 32, *supra.* Because this issue is not presented, the court has found it unnecessary to determine whether these rates were in fact below market, as the Government contends.

those distinguished previously) in which taxpayers have been allowed to deduct payments that appear at first to be closely associated with the taxpayer's ownership of stock. These holdings carve an exception to the general rule mandating capitalization. *Interstate Transit Lines v. C.I.R.*, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943); *Deputy v. DuPont*, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940). They are grounded in particular factual records that establish a close connection between the taxpayer's business and the expenditures it incurs. *See, e.g., Camp Manufacturing Co.*, 3 T.C. 467 (1944). The premise of these decisions is that a taxpayer may deduct all payments that "directly" or "proximately" benefit its business, even if these expenditures simultaneously serve the taxpayer's interest as a shareholder. *Allen v. C.I.R., supra*, 283 F.2d at 790 (7th Cir.1960). *But cf. C.I.R. v. Lincoln Savings and Loan Association*, 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971); *NCNB Corp. v. United States*, 684 F.2d 285 (4th Cir.1982) (en banc).[34] Accelerated cost recovery remains inappropriate, of course, when the nexus between the expense and the taxpayer's business is "remote" or otherwise falls below the standard announced above. *Allen v. C.I.R., supra*, 283 F.2d at 791.

The decision in *Camp Manufacturing Co., supra*, is illustrative. The taxpayer was a lumber mill that subscribed to 50% of the stock in a new paper mill corporation. Three weeks later the taxpayer discovered a need for working capital. To raise the necessary funds, five thousand shares of the new subsidiary were sold. As part of the deal, the taxpayer guaranteed the payment of the stocks' dividend and guaranteed the stocks' redeemability. After four years, the taxpayer felt it advisable to eliminate the contingent liabilities it had assumed. It secured releases of its pledges by paying the holders of the paper mill stock $5 per share. The amounts so spent were deducted from ordinary income.

Most simplistically viewed, the payments grew out of the sale of stock. They reduced the "amount realized" on the transaction, thereby affecting the capital gain (or loss) recognized. The Tax Court, however, adopted a different view of the payments' "origin":

---

**34.** The court has some doubt as to whether the doctrine relied upon by taxpayer survives *Lincoln Savings.* At issue there was the deductibility of a savings and loan association's payment to the Federal Savings and Loan Insurance Corporation's "Secondary Reserve." The Court in that case recognized that the payment "was made in carrying on a trade or business," id., 403 U.S. at 354, 91 S.Ct. at 1899, but nevertheless held for the Government. What was crucial was that the "payment serves to create or enhance for Lincoln what is essentially a separate or distinct additional asset." *Id.* It could thus be argued on the basis of *Lincoln Savings* that a payment is capital whenever it enhances the value of a taxpayer's holdings in a subsidiary, regardless of the connection between the payment and the taxpayer's business. *Cf. Baltimore Aircoil Company v. United States,* 333 F.Supp. 705 (D.Md.1971) (parent allowed to deduct subsidiary's start-up costs because separate corporate forms were illustratory and could be disregarded).

Given its ultimate findings, this court has found it unnecessary to examine further the implications of *Lincoln Savings.* At the very least, however, the doubts expressed above counsel against a ruling in Nalco's favor on the authority of *Cubbedge Snow,* 31 T.C. 585 (1958), acq. 1959–1 C.B. 5. In *Snow,* lawyers were allowed to deduct payments they had made to underwrite the initial operating losses of a newly-created savings and loan association. The latter institution referred a substantial amount of legal work to the taxpayers. Indeed, the taxpayers had set up the institution for this very purpose. The deduction was sustained by the Tax Court on the theory that the "expenditures in question had a definite purpose proximately related to the law practice of petitioners." *Id.,* 31 T.C. at 592. The Court carefully noted, however, that

> petitioners have not acquired any specific asset in return for their payments which made good the operating deficit of the Association. A Federal savings and loan association has no capital stock, and no individual, regardless of his contributions to the Association, may share in its income or surplus except as a member-shareholder in proportion to his or her deposit. Consequently, petitioners, by their guaranty and subsequent payments pursuant thereto, acquired no capital asset in the form of a disposable interest in a going concern.

*Id.* at 593. In short, "a separate or distinct additional asset" was not present in *Cubbedge Snow.* The same is not true here. Nalco's payments are closely tied to its shareholdings. *See supra.*

Petitioner had the unquestioned right to determine the means of replenishing its working capital and in adopting therefor the plan to sell a portion of the preferred stock purchased from the new company it exercised a judgment to subserve a legitimate business purpose. To effectuate the sale of the stock the obligation of guaranty was necessary. It was therefore a necessary obligation incurred in carrying on petitioner's business....

Since the obligation of guaranty was a necessary and ordinary obligation incurred by petitioner in carrying on its business, the expense in the amount necessary to secure a cancellation or release of such guaranty is a necessary and ordinary business expense.

*Id.,* 3 T.C. at 472. The deduction was allowed because the obligation flowed directly from the taxpayer's business need. It was not fatal that the payment also served the taxpayer's shareholding interest. *See also Standard Oil Co. of New Jersey,* 11 T.C. 843, 854 (1948).

Nalco may not invoke this line of thought. There is precious little, if any, evidence in the record justifying the conclusion that Nalco's business interests were served directly by its efforts on behalf of its subsidiaries. As for the profitable subsidiaries that caused the FDIC problems, it is not even clear which companies are implicated. *A fortiori,* the record offers no support for the argument that these firms performed services of benefit to Nalco, and that Nalco's efforts to maintain these investments thus served its interests directly.

Nalco's case is slightly better with respect to Nalfloc. The ICI-Nalco joint venture agreement provides that Nalfloc will purchase products made by Nalco (as well as ICI) whenever an appropriate need arises, (Ex. 3), will recommend such purchases to its customers, (*id.*) and will pay Nalco a portion of a 4% annual "technical service

fee." (Ex. 4) The successful operation of Nalfloc thus influences to some extent the profitable development of Nalco's business. Indeed, Nalfloc was created for this very purpose—"to inject Nalco technology into the U.K. ... where I.C.I. had an existing product and customer base ... to expand the business and profitability of both, for both parent companies." (Palmer Dep. at 8–9).

What Nalco has not shown, however, is that Nalfloc's ability to perform these tasks was *directly* aided by Nalco's decision to incur the obligations at issue. The initial set of refinancing loans clearly had no impact whatsoever on Nalfloc. As Nalco itself points out, Nalfloc was in the exact position both before and after these transactions were consummated. (Reply Brief of Plaintiff at 16) At both moments Nalfloc had a right to use 1,300,000 pounds at 7% per year. *See* note 31, *supra.* By contrast, the situation with respect to the renewal loans is somewhat more complicated. Nalco's later decisions to indemnify Capital allowed Nalfloc to obtain loan proceeds the British subsidiary could not otherwise have procured.[35] However, all this proves is that Nalco subsidized, in part, Nalfloc's receipt of general operating funds.[36] Such behavior did not directly influence Nalfloc's ability to take particular actions for the parent's benefit. As the Court of Claims has noted, a taxpayer's business posture is only "remote[ly]" affected by its payment of a subsidiary's "current operating costs." *Young & Rubicam, Inc. v. United States,* 410 F.2d 1233, 1243 (Ct.Cl.1969): *see also Interstate Transit Lines v. C.I.R.,* 319 U.S. 590, 594, 63 S.Ct. 1279, 1282, 87 L.Ed. 1607 (1943) (suggesting that a taxpayer may deduct the amounts spent in satisfying the debts of a subsidiary if the assumption is "dependent upon a corresponding service or benefit rendered to the" taxpayer); *Columbian Rope Co.,* 42 T.C. 800, 815 (1964) (parent not

---

**35.** As noted, Nalfloc's contractual right to borrow 1,300,000 pounds had expired at the moment of each renewal. *See* note 31, *supra.* At these instances, Nalfloc was at the mercy of Capital, an entity that would not have loaned without Nalco's pledge.

**36.** It was always contemplated that the 1,300,000 pounds would be for "the start-up of Nalfloc and to continue its operations." (Palmer Dep. at 10)

allowed to deduct salary payments made to American executives employed by Philippine subsidiary; argument that these payments insured the parent's ability to buy raw materials cheaply from subsidiary rejected because, *inter alia,* there was no formal arrangement linking the salary payments to the amount billed to the parent). Nalco's payments fall within this rule.[37]

To sum up, Nalco has not shown that its payments bore the necessary relationship to its own business. The need to incur the obligations under scrutiny grew out of Nalco's status as a shareholder. Furthermore, the efforts made by the taxpayer to correct its investment difficulties did not proximately influence the course of its business.[38]

### III. Section 165

■ Nalco alternatively claims that it suffered deductible losses under section 165(a) of the Code.[39] In light of the analysis previously developed, this argument requires little discussion. It rests on the following erroneous belief:

> When Nalco made [its] payment[s] it acquired no asset or tangible thing in re-

turn; it was simply out-of-pocket the sum paid. Accordingly, Nalco suffered an uncompensated loss.

(Brief of Fact and Law of Plaintiff at 26) Nalco has assumed what it must prove, namely, that it received nothing in return for its outlays. The previous discussion, however, establishes quite the contrary. As explained in section II.C., *supra,* the relevant expenditures, when viewed in the proper light, served to enhance Nalco's basis in its affected shareholdings. *See* note 33, *supra.* Nalco thus received "something" for its efforts—the prospect of a lower capital gain (or greater capital loss) upon the ultimate sale or liquidation of the subsidiaries in question.

■ Neither of the two decisions cited by Nalco supports its position. Unlike the "loss" at issue here, the losses found deductible in *Charles G. Berwind,* 8 T.C. 1112 (1947), and *Santa Anita Consolidated, Inc.,* 50 T.C. 536 (1968), were incurred in the course of the taxpayers' businesses.[40] While a business nexus need not be estab-

---

**37.** None of the remaining decisions cited by Nalco suggests a contrary result. A deduction was sustained in *Fall River Gas Appliance Co.,* 42 T.C. 850 (1964), *affd.,* 349 F.2d 515 (1st Cir.1965), but the Court was careful to note that the facts did not present "the usual situation of a parent paying expenses of its subsidiary." 42 T.C. at 858; *see also Young & Rubicam, Inc. v. United States, supra,* 410 F.2d at 1243 (interpreting *Fall River* similarly); *United States v. Berger,* 325 F.Supp. 1297, 1301 (S.D. N.Y.1971) (*Fall River* presents "unique and compelling circumstances").

Also distinguishable are the payments in *Fishing Tackle Products Co.,* 27 T.C. 638 (1957), and *Texas and Pacific Ry. Co.,* 1 TCM (CCH) 863 (1943). The outlays at issue in those cases served merely to increase the amounts paid by the taxpayers for goods and services purchased from their subsidiaries. Similarly, in *Chicago Pneumatic Tool Co.,* 21 B.T.A. 569 (1930), the deduction was proper because the parent's payment acted, in effect, as an adjustment to the price paid by the subsidiary for the parent's goods.

**38.** Wholly unpersuasive is the taxpayer's contention that the requisite tie between its expenditures and its business is established by the Government's concession that the subject payments were "necessary" within the meaning of section 162(a). The term "necessary" is "the minimal requirement that the expense be

'appropriate and helpful' for the development of the [taxpayer's] business." *C.I.R. v. Tellier,* 383 U.S. 687, 689, 86 S.Ct. 1118, 1119, 16 L.Ed.2d 185 (1966). An expenditure may meet this low threshold in an attenuated, remote manner, and thus still fail to be "proximately" connected to the taxpayer's business.

**39.** Section 165(a) provides:

There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

**40.** In *Berwind,* the loss was found to have originated in a plan designed to protect the taxpayer's business reputation. 8 T.C. at 1115. It has already been explained why Nalco may not invoke a similar theory. *See* section II.B., *supra.* (It is perhaps also relevant that in a later decision the Tax Court retreated substantially from this factual finding *Charles G. Berwind,* 20 T.C. 808 (1953), *affd. per curiam,* 211 F.2d 575 (3d Cir.1954).)

In *Santa Anita,* "the genesis of the payment" was the taxpayer's desire to cancel a contingent liability it had assumed. 50 T.C. at 559. The taxpayer feared that its potential exposure "might eventually [have] affected" "its own operations." *Id.* at 543.

lished in all cases for a corporate taxpayer to prevail under section 165, *International Trading Company v. C.I.R.*, 484 F.2d 707 (7th Cir.1973), it nevertheless remains equally true that no taxpayer may deduct a loss that is "properly chargeable to capital account." I.R.C. § 1016(a)(1). The presence of a business connection is thus relevant in a section 165 proceeding to the extent it demonstrates the impropriety of matching the subject "loss" with a particular capital account. Nalco has shown no such impropriety, nor any other reason why capitalization should not occur.

#### IV. Order

For the reasons stated, judgment is entered in the Government's favor. The suit is dismissed.

It is so ordered.